STATE OF NEBRASKA, APPELLANT AND CROSS-APPELLEE, V. TERRY REYNOLDS, APPELLEE AND CROSS-APPELLANT.

457 N.W.2d 405

Filed June 29, 1990.    No. 88-816.

Michael G. Heavican, Lancaster County Attorney, and Thomas S. Jaudzemis, and Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellant.

Dennis R. Keefe, Lancaster County Public Defender, and Michael D. Gooch for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and RONIN and COLWELL, D. JJ., Retired.

SHANAHAN, J.
A jury in the district court for Lancaster County found Terry

Reynolds guilty of murder in the first degree and using a firearm to commit a felony. Neb. Rev. Stat. § 28-303(1) (Reissue 1989) states that a person commits murder in the first degree if he or she kills another person "purposely and with deliberate and premeditated malice . . . ." Neb. Rev. Stat. § 28-1205(1) (Reissue 1989) provides that any person who uses a firearm to commit any felony which may be prosecuted in a Nebraska court commits the offense of using a firearm to commit a felony. A three-judge panel, authorized by Neb. Rev. Stat. § 29-2520 (Reissue 1989), sentenced Reynolds to life imprisonment for his murder conviction. The judge who presided at Reynolds' jury trial sentenced Reynolds to 20 years' imprisonment on the firearm conviction, which sentence is to be served consecutively to the life sentence.

The State has appealed and claims that the sentences imposed on Reynolds are excessively lenient. See Neb. Rev. Stat. § 29-2320 (Reissue 1989) (prosecutor's appeal of defendant's sentence). In his cross-appeal, Reynolds contends that reversible error occurred in the exclusion of certain evidence from two psychiatrists called to testify for Reynolds, in the refusal of Reynolds' tendered instruction on intoxication, and due to the insufficiency of evidence for the murder conviction.

## BACKGROUND FOR THE FATALITY

*"Quarters" and Quarrels.*

After the evening of Friday the 13th, March 1987, had been spent in moving furnishings from the apartment of Grace and Robert Garner in Hickman, Nebraska, the movers, namely, Terry Reynolds and his wife, Hazel "Hassie" Reynolds, Tina Walker, and the Garners, adjourned around 11 p.m. to "drink a beer" in the Reynolds apartment, which was located in the same building as the Garner apartment. Sometime after midnight, the group of movers obtained a case of beer and decided to play "quarters," a game in which participants attempt to flip a coin into a glass of beer. The participant who is successful in that effort then selects another player to drink the beer from the glass containing the coin.

All participants in the quarters contest drank beer, but Terry

Reynolds and Tina Walker were also "taking shots" of whiskey. At the commencement of the quarters event, all players were "friendly and getting along real well." The atmosphere changed when Terry Reynolds and Tina Walker began "flirting" with each other. When Hassie Reynolds took Terry Reynolds aside and chided him about his flirting with Walker, he responded that "maybe I will get the orgy that I always wanted."

After 3 hours of quarters, the game halted. As Terry Reynolds went into the bathroom, Hassie Reynolds followed and again expressed her displeasure over Terry Reynolds' flirting with Tina Walker. When the Reynolds argument waned, Hassie Reynolds emerged from the bathroom and encountered Tina Walker. Terry Reynolds, emerging from the bathroom in pursuit of Hassie, seized his wife by the throat, dragged her into the children's adjoining bedroom, struck her "a number of times in the face," and pulled several clumps of hair from her head. Grace Garner entered the children's bedroom and attempted to stop Terry Reynolds from further injuring Hassie, but Terry Reynolds countered by shoving Grace to the floor. After Robert Garner intervened and the fracas had subsided, Hassie Reynolds assured the Garners that she was all right. Tina Walker, meanwhile, had left the apartment. Terry Reynolds apologized for his conduct, and the Garners left the Reynolds apartment.

After Garners' departure, Hassie and Terry Reynolds went to their bedroom; where Terry demanded that Hassie sexually satisfy him. On Hassie's refusal, Terry Reynolds repeatedly struck her and grabbed her hair "hard enough to pull [her] hair out." Terry Reynolds told Hassie that if she "didn't sexually satisfy him that he would leave and that [she would know] where he was going." Hassie replied that she did not care where Terry went so long as he left her alone. Terry Reynolds responded by inflicting additional physical abuse on Hassie, tearing the phone from the wall, and walking out of the apartment. Reynolds, who had acted as a drug informant for law enforcement, always kept a loaded ".38 revolver" in his apartment and, in his words, "I didn't go anywhere without my gun." As he was leaving the apartment, Terry Reynolds met Garners, again apologized to Grace Garner, said Hassie was

"fine," and gave Grace Garner permission to check on Hassie's condition. Terry Reynolds then meandered on foot through Hickman until "the next thing [he] knew [he] was on or almost right in front of Tina's house." As recounted by Terry Reynolds, "I was mad. I was hurt. I was mad at Hassie and I went up to Tina's house." Reynolds knocked on the door of the Walker house and was admitted by Tina's son, who had answered the door. On entry into the house, Reynolds found Tina asleep, removed his clothes, and shook Tina in an effort to awaken her for sexual intercourse. When she resisted, Reynolds struck Tina twice and choked her, but, for some reason, decided to terminate the episode and return to his apartment. As Reynolds was leaving the Walker house, he wiped the door handles on either side of the front door and told Tina to "go ahead and call the cops because it was [her] word against his and who were they going to believe."

While Terry Reynolds was on his trek to Tina's, Grace Garner went to the Reynolds apartment to check on Hassie, who, obviously, had been beaten. Subsequently, Heidi Cemer, the apartment manager, and her cousin, Shannon Warburton, arrived at the Reynolds apartment.

On Terry Reynolds' return to his apartment, he found Hassie Reynolds, Grace Garner, Heidi Cemer, and Shannon Warburton and told everybody "to get out of his home." When Heidi Cemer "told him to calm down," Terry Reynolds picked her up from a chair, threw her to the floor, grabbed her while she was lying on the floor, and raised a fist as if to hit her. At that point, Hassie Reynolds approached Terry Reynolds from behind and jumped on his back. During the ensuing struggle, Terry Reynolds flung Hassie to the floor and then chased Heidi Cemer, who was attempting to leave and obtain help. Terry Reynolds chased Cemer and caught her outside the apartment, where he trapped Cemer near a stairway, pointed the .38 revolver at Cemer's head, and told her that if she called anyone, he would kill Hassie and whomever might appear in response to any summons for help. As Reynolds was threatening Cemer, Shannon Warburton approached. Reynolds pointed the revolver at Warburton, but allowed her to pass by when Warburton indicated that she wanted only to go to Cemer's

apartment. During Reynolds' distraction, Cemer escaped.

Terry Reynolds returned to his apartment, where he found Hassie in the living room, pointed the .38 revolver at her nose, and stated, "[I]f anybody calls the law, I will kill you, I will kill Tabetha [Hassie's daughter who lived in the apartment] and I will kill the sheriff and myself." Immediately after these threats, Terry Reynolds and Hassie went to their bedroom, where Terry reminded Hassie what would happen "if the law was called." Shortly afterward, Terry Reynolds awakened his stepdaughter, Tabetha, and brought her into the bedroom with Hassie. While Hassie and Tabetha were in the bedroom, Terry, with the .38 revolver in hand, began pacing around the bedroom. Some 10 to 15 minutes later, Reynoldses heard a knock on the apartment door.

## THE SHOOTING

Wearing his official uniform, Deputy Craig Dodge of the Lancaster County Sheriff's Department arrived at the door of the Reynolds apartment in response to 911 calls. When Terry Reynolds asked who was at the door, Deputy Dodge replied "sheriff's department." Because Hassie's face had been beaten, Terry asked her to put on makeup, but she refused. Terry Reynolds then put the muzzle of the .38 revolver in Hassie's back and escorted her to the apartment door, which Hassie opened approximately 6 or 7 inches. Through the partially opened doorway, Deputy Dodge was visible from within the apartment. A conversation involving Dodge and both Reynoldses ensued. Early in the conversation, Dodge placed his foot in the doorway to prevent closing the door. Throughout the conversation, Hassie was positioned between Dodge and Terry Reynolds, who had kept the revolver, which was hidden from the deputy's view, pointed in Hassie's back. Although Hassie attempted to persuade Dodge that everything was all right, Dodge did not leave. Approximately 3 to 5 minutes into the conversation, Dodge attempted to enter through the apartment doorway, and also moved his hand toward his service revolver. At this point, Terry Reynolds removed the revolver from Hassie's back, pointed the weapon toward the ceiling, lowered the muzzle, and then fired a single shot which struck Dodge just

below the chin. Dodge fell in the middle of the doorway and, shortly thereafter, died from the injury sustained by the gunshot from Terry Reynolds' revolver.

After shooting Dodge, Terry Reynolds went to his bedroom, where he grabbed a jacket and shotgun, and returned to the apartment's front door. As Terry Reynolds was about to leave the apartment, he bent down and took Dodge's service revolver, exclaiming: "I am going to die tonight because I am not going to jail." Reynolds, carrying his shotgun, revolver, and Dodge's service weapon, left the apartment, ran a little distance, and then threw all the firearms into a nearby creek. Within a short time, Reynolds, having decided to return home, was en route to his apartment when he was confronted by Deputy Wesley Loos of the Lancaster County Sheriff's Department, who arrested Reynolds and had him brought to the sheriff's headquarters.

## REYNOLDS' TRIAL

### The Information.

In its information, the State charged that Reynolds "did purposely and with deliberate and premeditated malice kill Craig Dodge" (count I) and that Reynolds "did use a firearm or other deadly weapon in commission of a felony," namely, the murder of Craig Dodge (count II).

### Motions in Limine re Psychiatric Testimony.

Reynolds did not plead that he was "not responsible by reason of insanity at the time of the offense," that is, "not responsible by reason of insanity." Neb. Rev. Stat. § 29-2203 (Reissue 1989) (defense of "not responsible by reason of insanity").

In motions in limine, the State requested that Reynolds be barred from "eliciting opinion testimony at trial from psychiatrists or psychologists as to whether or not Terry Reynolds on March 14, 1987, did in fact purposely and with deliberate and premeditated malice kill Craig Dodge" (emphasis in original) and "from eliciting opinion testimony at trial from psychiatrists or psychologists as to whether or not the shooting of Craig Dodge by Terry Reynolds on March 14, 1987, was in fact an impulsive or spontaneous act" (emphasis in

original). Among bases for its motions in limine, the State asserted that the prospective psychiatric testimony on deliberateness and premeditation in Reynolds' shooting Dodge was not an "opinion or inference [which would] aid" the jury and was nothing more than "a factual determination which can be made by any juror who hears the evidence." When the court sustained the State's in limine motions, the court remarked:

> Well, I am not sure [the psychiatric] testimony would be that helpful to the jury. I think this is basically a jury question. It depends on how they are going to consider the evidence and what decision they will make as to whether [Reynolds] was — how scared he was when he was drunk . . . how much he had to drink, how much he worried about the assault on Tina and on and on and on. . . . I think this is for the jury to decide . . . . This doesn't mean that [the psychiatrists] won't, can't testify about certain areas, [Reynolds'] personality and so forth but it's the ultimate question here, I believe it's a jury question.

*Offers of Proof.*

During trial, outside the jury's presence, Reynolds made offers of proof through two psychiatrists, Drs. John Baldwin and Emmett M. Kenney.

According to Dr. Baldwin: "[T]houghtful or rational deliberation [is when] consequences are weighed, values are added, the need and the importance of the need is determined and choices are thought of or options are thought of and this would be a more reflective or what we call in our field premeditative act." Responding to defense counsel's inquiries whether Terry Reynolds deliberated or premeditated shooting Dodge, Dr. Baldwin testified:

> At the time the deputy was killed, I felt he was deliberate insofar as he deliberately lashed out at another human being. He wanted to stop, hurt, injure something of that nature, to this human being and the act was focused on that deputy sheriff. [However], the rational level of contemplation of an act did not occur. I do not feel he weighed other options of expressing whatever hostility he was expressing. I do not feel he weighed the consequences

of the act. I do not feel he thought of the pros and con and what possible gain or good it could do for him. I do not feel he was the least bit aware of the emotional forces that were causing him to act in that direction.

Defense counsel then referred to the definition of "deliberate" contained in NJI 14.10: " 'Deliberate' is defined as not suddenly, not rashly; but requires that the defendant considered the probable consequences of his act before doing the act."

Q. . . . . Using that definition, do you have an opinion that you have reasonable professional confidence in as to whether in fact Terry Reynolds deliberated at the time the gun discharged and Deputy Craig Dodge was killed?

A. Yes, I have an opinion.

Q. And can you tell us, please, what the opinion is, did he deliberate using that definition?

A. Using that definition, I do not feel he deliberated.

Dr. Baldwin further stated that his definition for "meditated" was "similar or equal to" his definition for "deliberate" and concluded that when Craig Dodge was killed, Terry Reynolds was acting impulsively, that is, "the act was impulsive."

As an additional offer of proof, Reynolds called Dr. Kenney, who expressed his opinion that Reynolds neither "premeditated" nor "deliberated the killing of Deputy Craig Dodge" and that Reynolds' responsive action regarding Dodge's presence "fits his [Reynolds'] usual pattern of behavior under stress. . . . It was an impulsive act."

*Psychiatric Testimony for the Jury.*

Both Drs. Baldwin and Kenney supplied evidence for the jury concerning Terry Reynolds' personality disorders.

According to Dr. Baldwin, at the time of the shooting Reynolds had elements of three different personality disorders: narcissistic, borderline, and antisocial. One with a narcissistic personality disorder "has a tendency to react with rage or intense despair if he faces — if he is forced to face inadequacies or forced to endure criticism." A borderline personality disorder, in part, prevents one from handling stress. A person

who has an antisocial personality disorder has "no ability to delay gratification of his urges." Dr. Baldwin further explained that impulsivity is a characteristic of all three of the aforementioned personality disorders and that Reynolds displayed impulsive behavior, which is distinguished from rational behavior in that impulsive behavior excludes an evaluation of actions and "the options . . . choices . . . the ways [one] can get this urge met . . . the consequences of meeting the urge . . . ." Dr. Baldwin concluded his testimony by expressing that Terry Reynolds was "an impulsive individual." Pursuant to the court's ruling on the State's motions in limine, defense counsel refrained from eliciting Dr. Baldwin's opinion that Reynolds had neither deliberated nor premeditated shooting Craig Dodge.

Dr. Kenney testified that Reynolds displayed a "history of poor impulse control . . . chaotic handling of anger with explosive rage." Also, Reynolds manifested "excessive autistic thinking," which, according to Dr. Kenney, means that "[p]eople have a fantasy life and their relationship with daydreaming and reality has a clear-cut boundary and in autistic thinking, a person gets into his daydreaming, if you will, and the use of fantasy and the line between reality and the fantasy gets a little blurred . . . ." Dr. Kenney also felt that Reynolds indicated "poor impulse control" and was "more impulsive than the average person." Explaining the relationship between autistic thinking and impulsivity, Dr. Kenney testified:

> [I]f you believe a plan has to go a certain way, and it doesn't go that way, then you have two choices. You can sit back and figure out another plan in a deliberate fashion, I guess I would say or calculated fashion, or you could just operate on impulse. . . . That is impulsive behavior . . . .

"[P]oor impulse control," according to Dr. Kenney, may result in "primitive maneuvers," such as threats and violence, that is, one with poor impulse control "goes into a primitive way of dealing with . . . stress by becoming violent." Since Reynolds displayed poor impulse control, when Reynolds was under stress, he would go "back to what worked before, temper. He has never really broken that pattern . . . . He is still under stress and tries to deal with it by temper and threatening behavior

. . . ." Regarding Reynolds' manner of solving any problem, Dr. Kenney related:

> As Terry described dealing with problems in his life, he describes, you know, deciding how things should go as he attempts to problem solve. He attempts whatever plans he lays out. Should it not work, he does what he thinks he wants to do. Should it not work, where he runs into complications, he traditionally does three things. He escalates the intensity of the demand, you know, or creates an uproar and if that doesn't work, then he attempts in his own way to explain it away, and if that doesn't work, then he acts impulsively.

Specifically, in reference to events surrounding the Dodge death, according to Dr. Kenney, when Reynolds was in the process of leaving the apartment,

> he leaves the house, he is going over and making love to that lady because in his fantasy life, in his autistic life, that is what he wants to do and he thinks it will work and it doesn't work, you know, and he is left without a contingency plan other than maybe violence, which in his case probably isn't thought about, he doesn't do problem solving. He doesn't, if you will, meditate on things the way other people do because of the autistic thing. He plans a scenario and it's going to work and that is as far as it goes. He doesn't go back again and say what happens is she says no. So when she says no, he impulsively becomes aggressive, repetition of his style of dealing with frustration and his lack of impulse control.

Dr. Kenney noted that Reynolds had a history of difficulties with alcohol consumption and that, consistent with Reynolds' method of solving problems, any person who consumes a great quantity of alcohol will act argumentatively and impulsively or show poor judgment and become physically aggressive. Dr. Kenney also felt that Reynolds was under "multiple stresses" and dealt with such stresses by becoming violent. Further, Dr. Kenney expressed an opinion that Reynolds' "poor impulse control" was reflected in the fact that Reynolds beat his wife and the very next moment asked her for sex, conduct which illustrates impulsive and self-defeating behavior with a poor

ability to plan. As an explanation for Reynolds' cessation of the attempted forcible sex with Tina Walker, Dr. Kenney testified: "Although Terry has impulse control problems, and he has poor frustration tolerance, he can bring his behavior under control." In view of the court's prior ruling on the State's motions in limine, defense counsel did not elicit whether Dr. Kenney had an opinion about deliberateness and premeditation by Reynolds regarding Dodge's death.

*Intoxication Instruction and Verdicts.*

Testimony from various witnesses indicated that Terry Reynolds consumed approximately a 12-pack of beer and a half pint of whiskey during the quarters competition. Participants in the quarters game supplied varied testimony about Reynolds' intoxication, ranging from Grace Garner's testimony, "I didn't figure he [Reynolds] was intoxicated," to Robert Garner's testimony that Reynolds was "drunk." Heidi Cemer and Shannon Warburton testified that Reynolds' eyes were "red" and "bloodshot" when they saw Reynolds shortly before the Dodge fatality. A deputy sheriff testified that Reynolds, when he was arrested, was "slurring" his words and was unsteady on his feet. However, another deputy stated that he did not notice slurring in Reynolds' speech or any difficulty in Reynolds' walking.

At the instruction conference, the court proposed to instruct the jury through "INSTRUCTION NO. 16," which reflects NJI 14.31:

Ordinarily, voluntary intoxication is no justification or excuse for crime; but excessive intoxication by which a person is wholly deprived of reason may prevent deliberation, premeditation or having the intent charged.

If you find that the defendant was intoxicated, that fact should be considered by you, together with all the facts and circumstances in evidence, for the purpose of determining whether or not you have a reasonable doubt that the defendant was at the time in question capable of deliberation, premeditation, or having the intent charged.

Defense counsel objected to the court's proposed instruction concerning intoxication and offered the following instruction:

Evidence of consumption of alcohol by the defendant has been received. That evidence may be considered by you, along with all the other evidence, to determine if you have a reasonable doubt as to whether the defendant killed Craig Dodge purposefully and with premeditated and deliberate malice.

After receipt of instructions which included instruction No. 16 set out above, the jury deliberated and returned a verdict of guilty on both charges against Reynolds.

## SENTENCES IMPOSED

A three-judge panel sentenced Reynolds to life imprisonment for the Dodge homicide. Later, the judge who presided in Reynolds' jury trial sentenced Reynolds to imprisonment for 20 years on the firearm conviction, a sentence which was consecutive to the sentence of life imprisonment. The sentencing process and sentences imposed on Reynolds will be considered in relation to the State's claim that both sentences imposed on Reynolds are excessively lenient.

## ASSIGNED ERRORS

Although the State has appealed and claims that the sentences imposed on Reynolds are excessively lenient, Reynolds has cross-appealed and asserts that certain prejudicial errors occurred in his trial which necessitate reversal of his murder conviction and warrant a new trial on the murder charge. If reversible errors occurred in Reynolds' trial, then reversing Reynolds' murder conviction and, correspondingly, setting aside the sentence imposed for the murder conviction obviates consideration of the State's appeal regarding the life sentence imposed on Reynolds. Hence, we proceed first to Reynolds' cross-appeal to decide whether Reynolds' murder conviction is legally sustained.

## ERRORS ALLEGED BY REYNOLDS

Reynolds claims that reversible error occurred when the trial court excluded psychiatric opinions that Reynolds did not deliberate or premeditate shooting and killing Craig Dodge. Reynolds also contends that the court failed to instruct properly

on the issue of intoxication in relation to the murder charge against Reynolds. Finally, Reynolds claims that the evidence is insufficient to sustain his conviction for murder in the first degree.

*Exclusion of the Opinions on "Deliberate" and "Premeditate."*

Exclusion of psychiatric opinion testimony on the question whether Reynolds' shooting Dodge was a deliberate and premeditated act, Reynolds argues, constitutes a violation of a defendant's sixth amendment right to present relevant evidence in defense to a criminal charge. See *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

To evaluate Reynolds' argument, we first review the elements for the crime of first degree murder: "A person commits murder in the first degree if he kills another person . . . purposely and with deliberate and premeditated malice." § 28-303(1).

"Purposely," as an element of first degree murder, means "intentionally." *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989). In *Batiste*, we also stated:

"Deliberate malice" and "premeditated malice" are separate and distinct elements of the crime of murder in the first degree. *Pembrook v. State*, 117 Neb. 759, 222 N.W. 956 (1929).

"Deliberate" means not suddenly, not rashly; but deliberation requires that the defendant considered the probable consequences of his or her act before doing the act. See NJI 14.10. Cf. *Pembrook v. State, supra* (for origin of language). A person kills with "deliberate malice" when he or she, without just cause or excuse, kills another not suddenly or rashly, but after considering the probable consequence of doing the act.

"Premeditated" means to have formed a design to commit an act before it is done. . . . A person kills with "premeditated malice" if before the act causing the death occurs, he or she has formed the intent or determined to kill the victim without legal justification.

231 Neb. at 491, 437 N.W.2d at 132. See, also, Neb. Rev. Stat. § 28-302(3) (Reissue 1989): "Premeditation shall mean a design

to do something before it is done."

At trial and on appeal, Reynolds has admitted that he shot and killed Craig Dodge. However, Reynolds asserts that he did not kill Dodge with "deliberate and premeditated malice" and, thus, did not commit first degree murder. To support this assertion, Reynolds desired to have Drs. Baldwin and Kenney testify that he did not deliberate and premeditate shooting Dodge. A syllogism provides an insight into Reynolds' assigned error based on exclusion of the psychiatric testimony: One who is impulsive does not deliberate and premeditate an act by weighing the consequences of the act. Terry Reynolds is impulsive. Therefore, Terry Reynolds did not deliberate or premeditate the act of shooting Craig Dodge. Reynolds contends that Drs. Baldwin and Kenney, testifying before the jury, should have been allowed to express the conclusion in the foregoing syllogism, whereas the trial court excluded the psychiatrists' conclusory opinions concerning deliberation and premeditation in Reynolds' shooting Dodge.

*Admissibility under Neb. Evid. R. 704.*

According to Reynolds, Neb. Evid. R. 704, Neb. Rev. Stat. § 27-704 (Reissue 1989), requires admission of the psychiatric opinion evidence on deliberateness and premeditation in reference to Reynolds' shooting Dodge. Pursuant to Neb. Evid. R. 704: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Neb. Evid. R. 704 is identical to Fed. R. Evid. 704, as initially adopted, for which the advisory committee's note includes:

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of

useful information. . . . The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17. Efforts to meet the felt needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule. Thus a witness could express his estimate of the criminal responsibility of an accused in terms of sanity or insanity, but not in terms of ability to tell right from wrong or other more modern standard. And in cases of medical causation, witnesses were sometimes required to couch their opinions in cautious phrases of "might or could," rather than "did," though the result was to deprive many opinions of the positiveness to which they were entitled, accompanied by the hazard of a ruling of insufficiency to support a verdict. In other instances the rule was simply disregarded, and, as concessions to need, opinions were allowed upon such matters as intoxication, speed, handwriting, and value, although more precise coincidence with an ultimate issue would scarcely be possible.

. . . .

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

We note that Fed. R. Evid. 704 was amended in 1984 by adding section or paragraph (b), which provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

As reflected in the report of the Senate Committee on the

Judiciary concerning the amendment by Fed. R. Evid. 704(b):

The purpose of this amendment is to eliminate the confusing spectacle of competing expert witnesses testifying to direct contradictory conclusions as to the ultimate legal issue to be found by the trier of fact. . . . [E]xpert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been. . . .

. . . .

Moreover, the rationale for precluding ultimate opinion psychiatric testimony extends beyond the insanity defense to any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven. The Committee has fashioned its Rule 704 provision to reach all such "ultimate" issues, *e.g.*, premeditation in a homicide case, or lack of predisposition in entrapment.

S. Rep. No. 225 *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3412-13.

Pursuant to Neb. Evid. R. 704, an expert's opinion, which is "otherwise admissible," is not objectionable and, therefore, inadmissible because the opinion embraces an ultimate issue to be decided by the trier of fact. Consequently, in the absence of a provision such as Fed. R. Evid. 704(b), the opinions of Drs. Baldwin and Kenney regarding deliberateness and premeditation in Reynolds' shooting Dodge were not rendered inadmissible simply because the opinions embraced an ultimate issue for the jury in Reynolds' case.

At the fringe of Neb. Evid. R. 704, and perhaps beyond, is *Shover v. General Motors Corp.*, 198 Neb. 470, 253 N.W.2d 299 (1977), an action against an automobile manufacturer to recover on the theory of strict liability for personal injuries. The station wagon in which the plaintiffs were riding struck a highway guardrail, skidded, and finally overturned. This court noted that the "ultimate fact at issue . . . was the cause of the station wagon turning into the guardrail." 198 Neb. at 475, 253 N.W.2d at 303. On that issue, this court held that the defendant's expert witness, a traffic engineer and consultant in

the field of traffic accidents, properly testified pursuant to Neb. Evid. R. 704 that in his opinion, the cause of the vehicle's striking the guardrail was "because the driver fell asleep." 198 Neb. at 475, 253 N.W.2d at 303.

Since an expert's opinion embracing an ultimate issue is not inadmissible if the opinion is "otherwise admissible," Neb. Evid. R. 704 must be read in conjunction with Neb. Evid. R. 702 (testimony by experts), 401 (relevant evidence defined), 402 (irrelevant evidence inadmissible), and 403 (exclusion of relevant evidence). See *Little Oil Co., Inc. v. Atlantic Richfield Co.*, 852 F.2d 441, 446 (9th Cir. 1988): "Rule 704 does not render all expert testimony admissible."

*An Expert's Testimony; Admissibility in General.*

Among the Nebraska Evidence Rules are Neb. Evid. R. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise"; Neb. Evid. R. 401: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; Neb. Evid. R. 402, in part: "Evidence which is not relevant is not admissible"; and Neb. Evid. R. 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In determining whether an expert's testimony is admissible pursuant to the Nebraska Evidence Rules, a court considers four preliminary and interrelated questions: (1) Does the witness qualify as an expert pursuant to Neb. Evid. R. 702? (2) Is the expert's testimony relevant? (3) Will the expert's testimony assist the trier of fact to understand the evidence or determine a controverted factual issue? (4) Should the expert's testimony, even though relevant and admissible, be excluded in

light of Neb. Evid. R. 403?

*Qualification of an Expert.*

For admissibility of an expert's testimony pursuant to Neb. Evid. R. 702, the witness must be an expert whose testimony will assist the trier of fact to understand the evidence or determine a factual issue. Therefore, in considering admissibility of an opinion under Neb. Evid. R. 702, a trial court first determines whether a witness is an expert who meets the qualifications specified in Neb. Evid. R. 702. See *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979). Whether a witness is qualified to testify as an expert under Neb. Evid. R. 702 is a preliminary question of admissibility for a trial court under Neb. Evid. R. 104(1), Neb. Rev. Stat. § 27-104(1) (Reissue 1989). See, *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987); *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). Whether a witness is an expert under Neb. Evid. R. 702 depends on the factual basis or reality behind a witness' title or underlying a witness' claim to expertise. See *Jenkins v. United States*, 307 F.2d 637 (D.C. Cir. 1962). Therefore, a trial court's factual finding pursuant to Neb. Evid. R. 104(1) concerning a determination whether a witness qualifies as an expert under Neb. Evid. R. 702 will be upheld on appeal unless the trial court's finding is clearly erroneous. See, *Alfonso v. Lund*, 783 F.2d 958 (10th Cir. 1986) (a trial court's finding under Fed. R. Evid. 104(a) that a physician was qualified as an expert in a particular area was not reversible unless such finding was clearly erroneous); *Compagnie Des Bauxites De Guinee v. Ins. Co. of N.A.*, 721 F.2d 109 (3d Cir. 1983) (under Fed. R. Evid. 104(a), a trial court's finding that a civil engineer qualified as an expert on the cause of loss of production is upheld unless the finding is clearly erroneous); *United States v. Thomas*, 676 F.2d 531 (11th Cir. 1982) (whether a witness is qualified as an expert involves a factual determination that will be sustained unless clearly erroneous); *United States v. Johnson*, 575 F.2d 1347 (5th Cir. 1978) (a trial court's determination concerning the expert qualifications of a witness is sustained unless manifestly erroneous). We realize that some decisions of this court, before

and after adoption of the Nebraska Evidence Rules in 1975, have expressed that a determination of a witness' qualifications as an expert is within a trial court's discretion. See, *Mathine v. Kansas-Nebraska Nat. Gas Co., Inc.*, 189 Neb. 247, 202 N.W.2d 191 (1972); *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). However, consistent with this court's other decisions involving a preliminary question of admissibility, for example, constitutional admissibility of evidence in a criminal case, see *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988), which have utilized the standard of "clearly erroneous," a trial court's determination of a witness' qualification as an expert shall be evaluated under the standard of "clearly erroneous."

*The "Frye" Test or Standard.*

In *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), the court, considering admissibility of a "lie detector" test, enunciated a standard for admissibility of scientific evidence: "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

While mentioning *Frye* in a string of citations with no discussion about the principle applied in the decisions cited, see *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949), or obliquely referring to *Frye* in excerpts from judicial opinions of other jurisdictions, see *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983), this court has, nevertheless, recognized and adopted the *Frye* test or standard for admissibility of scientific evidence. In *Boeche, supra*, this court, considering admissibility of a polygraph, or lie detector, test, concluded that

the scientific principle involved in the use of such polygraph has not yet gone beyond the experimental and reached the demonstrable stage, and that it has not yet received general scientific acceptance. The experimenting psychologists themselves admit that a wholly accurate test is yet to be perfected.

151 Neb. at 377-78, 37 N.W.2d at 597.

Under the test or standard enunciated in *Frye*, reliability for

admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or is based on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. See, *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981) (rejection of hypnosis to refresh a witness' recollection); *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551 (1986) (horizontal nystagmus test rejected); M. Graham, Handbook of Federal Evidence § 703.2 (2d ed. 1986).

*"Assist the Trier of Fact."*

If an expert's testimony lacks probative value, see Neb. Evid. R. 401, the testimony is irrelevant and is inadmissible. See Neb. Evid. R. 402. It appears axiomatic that irrelevant evidence will not "assist the trier of fact." Thus, relevance of an opinion is among the initial questions for a trial court in determining admissibility of an expert's opinion under Neb. Evid. R. 702. See, *United States v. Shorter*, 809 F.2d 54 (D.C. Cir. 1987); *State v. Brown*, 297 Or. 404, 687 P.2d 751 (1984).

If a witness is qualified as an expert pursuant to Neb. Evid. R. 702, a court considering admissibility of the expert's testimony, which may include an opinion, must decide whether the testimony is likely to assist the trier of fact to understand the evidence or determine a factual issue. See, *Getzschman v. Miller Chemical Co.*, 232 Neb. 885, 443 N.W.2d 260 (1989); *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979); *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); *State v. Petrich*, 101 Wash. 2d 566, 683 P.2d 173 (1984).

Must a court exclude an expert's testimony or opinion about a subject which is within the comprehension of an average juror? An answer in the negative is suggested in 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] at 702-15 to 702-16 (1988):

> Must a court exclude expert testimony if the subject is within the comprehension of the average juror? Such a test is incompatible with the standard of helpfulness expressed in Rule 702. First, it assumes wrongly that there

is a bright line separating issues within the comprehension of jurors from those that are not. Secondly, even when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bring to bear on the same issue which would be helpful.

Consistent with the preceding excerpt from Weinstein and Berger, this court has stated: "Expert testimony is permitted even in areas where laymen have competence to determine the facts testified to by the expert where a trial court may feel the opinion would assist them." *Christensen v. City of Tekamah,* 201 Neb. 344, 351, 268 N.W.2d 93, 98 (1978); *Hegarty v. Campbell Soup Co.,* 214 Neb. 716, 335 N.W.2d 758 (1983). As observed by McCormick, an expert's contribution in litigation "is the power to draw inferences from the facts which a jury would not be competent to draw. . . . In fact, Rule 702 should permit expert opinion even if the matter is within the competence of the jurors if specialized knowledge will be helpful . . . ." McCormick on Evidence § 13 at 33 (E. Cleary 3d ed. 1984).

The helpfulness standard expressed in Neb. Evid. R. 702, that is, the expert's testimony or opinion will "assist the trier of fact," has been characterized by Weinstein and Berger:

The helpfulness test subsumes a relevancy analysis. In making its determination, the court must proceed on a case-by-case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently existing about the subject of the proposed testimony and (2) on the court's appraisal of the facts of the case.

3 J. Weinstein & M. Berger, *supra,* ¶ 702[02] at 702-18. See, also, *U.S. v. DeSoto,* 885 F.2d 354 (7th Cir. 1989).

Under Neb. Evid. R. 704, the test is not whether the expert's opinion or inference invades the province of the jury, but whether the opinion or inference is otherwise admissible and, in accordance with Neb. Evid. R. 702, will "assist the trier of fact" to understand the evidence or determine a fact in issue. See, *Bauman v. Centex Corp.,* 611 F.2d 1115 (5th Cir. 1980); *Little Oil Co., Inc. v. Atlantic Richfield Co.,* 852 F.2d 441 (9th Cir. 1988) (the test for admissibility under Rule 704 is whether the jury will receive appreciable help from the expert's testimony or

opinion). According to Weinstein and Berger, "[m]ost exclusive rulings are explicable as findings by the court that the issue is inappropriate for expert resolution, either because the expert is not needed or because [the expert] is incapable of rendering assistance." 3 J. Weinstein & M. Berger, *supra*, ¶ 704[03] at 704-17. As one court has expressed, the "helpfulness test" or criterion requires that the expert's testimony must "add precision or depth to the jury's ability to reach conclusions about the subject" before the jury. *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn. 1980).

An expert's testimony, although relevant, may be excluded if the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence. See Neb. Evid. R. 403. See, also, *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261 (7th Cir. 1988); *State v. Hall*, 406 N.W.2d 503 (Minn. 1987); *United States v. McBride*, 786 F.2d 45 (2d Cir. 1986); *State v. Brown*, 297 Or. 404, 687 P.2d 751 (1984).

The determination whether an expert's testimony or opinion will be helpful to a jury or assist the trier of fact in accordance with Neb. Evid. R. 702 involves the discretion of a trial court, whose ruling on admissibility of an expert's testimony or opinion will be upheld on appeal unless the trial court abused its discretion. See, *Little v. Gillette*, 225 Neb. 70, 402 N.W.2d 852 (1987); *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); *Scholz Homes, Inc. v. Wallace*, 590 F.2d 860 (10th Cir. 1979). A reason for the aforementioned standard of review in relation to admission or exclusion of an expert's opinion was expressed in *U.S. v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987): "The trial judge has a hands-on familiarity with the nuances of the case—nuances which may not survive transplantation into a cold appellate record. Thus, the [trial] court's assessment of what will or will not assist the jury is entitled to considerable deference in the Rule 702 milieu." Cf. *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202 (1989) (relevance of offered evidence, otherwise admissible, involves the discretion of a trial court, whose ruling on relevance will be upheld on appeal unless the trial court abused its discretion).

Therefore, in Reynolds' case the question becomes: Did the trial court abuse its discretion in concluding that the psychiatric opinions would not assist the jury in Reynolds' trial and, therefore, in excluding the psychiatrists' testimony that Reynolds did not act with deliberateness and premeditation in shooting Craig Dodge?

This court has stated that "evidence of an accused's mental condition at the time the offense was committed is always admissible to prove absence of intent . . . ." *State v. Vosler*, 216 Neb. 461, 468, 345 N.W.2d 806, 811 (1984). In *Washington v. State*, 165 Neb. 275, 281, 85 N.W.2d 509, 513 (1957), which antedates the Nebraska Evidence Rules, this court stated: " '[E]vidence of the condition of the mind of the accused at the time of the crime . . . may be introduced . . . to show absence of any deliberate or premeditated design.' "

In *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), the trial court, in a first degree murder prosecution, would not allow a defense psychiatrist to testify that the "defendant's diminished mental capacity affected his ability to make and carry out plans. [The trial court] also did not allow [the expert] to testify whether he determined that defendant was under the influence of mental or emotional disturbance at the time of the offense." 322 N.C. at 246, 367 S.E.2d at 641. In finding that the trial court erred in excluding the psychiatrist's testimony, the Supreme Court of North Carolina stated that, pursuant to N.C. Evid. R. 702, which is substantially the same as Neb. Evid. R. 702, "[t]estimony that a defendant was incapable of planning his activities or carrying out plans, and that he was under mental or emotional disturbance, could assist the jury in determining whether a defendant in fact premeditated and deliberated." 322 N.C. at 248, 367 S.E.2d at 643. The *Shank* court also noted that although the opinion testimony tended to show that the defendant lacked the capacity to deliberate and premeditate, the testimony was admissible on an "ultimate issue" under N.C. Evid. R. 704 (which is substantially the same as Neb. Evid. R. 704).

The Supreme Court of North Carolina, on the same day it issued *State v. Shank, supra*, also issued *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). In *Weeks*, the defendant was

charged with the first degree murders of his father and stepmother. Defense psychiatrists testified about Weeks' mental condition at the time of the homicides; for example, chronic emotional disturbance characterized by an inability to deal with stress, an adjustment disorder with mixed disturbance of emotions and conduct, vulnerability to stress, living in a fantasy world, and a proclivity to rage when rebuffed. However, in *Weeks*, the trial court precluded defense experts from testifying that Weeks did not act with deliberation and premeditation when he committed the homicides in question. The *Weeks* court held that the opinion testimony about deliberation and premeditation was properly excluded and stated:

> [I]t is not error for a trial court to refuse to admit expert testimony embracing a legal conclusion that the expert is not qualified to make. [Citations omitted.]
>
> . . . .
>
> Such testimony [about deliberation and premeditation] embraces precise legal terms, definitions of which are not readily apparent to medical experts. What defendant sought to accomplish with this testimony was to have the experts tell the jury that certain legal standards had not been met. [Citation omitted.] We are not convinced that either the psychologist or the psychiatrists were in any better position than the jury to make those determinations. Having the experts testify as requested by defendant would tend to confuse, rather than help, the jury in understanding the evidence and determining the facts in issue.

322 N.C. at 164, 166-67, 367 S.E.2d at 903-04. See, also, *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988). The difference between *Shank, supra*, and *Weeks, supra*, appears to be that in *Shank* the court was faced with an expert's opinion regarding the defendant's mental ability to effectuate subjective or mental elements of a crime, whereas in *Weeks*, the excluded psychiatric testimony related to the accomplished fact of deliberation and premeditation which, therefore, involved the opinion that the defendant was not guilty of murder in the first degree. In *Weeks*, the Supreme Court of North Carolina concluded that a

psychiatrist, obviously an expert in the field of psychiatry, was not an expert, for the purpose of N.C. Evid. R. 702, in determining whether the crime of first degree murder had been committed.

In *Gurganus v. State*, 451 So. 2d 817 (Fla. 1984), which involved two convictions for first degree murder, the trial court excluded an expert's testimony that Gurganus' actions were from a " 'depraved mind' " rather than a " 'premeditated plan.' " 451 So. 2d at 821. However, holding that exclusion of the expert's testimony was proper, the Florida Supreme Court stated:

> We recognize that: "The trial court has broad discretion in determining the range of subjects on which an expert witness may be allowed to testify, and, unless there is a clear showing of error, its decision will not be disturbed on appeal. . . . This discretion, however, is not boundless and expert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts." *Johnson v. State*, 393 So.2d 1069, 1072 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). We find that the opinions the psychologists were asked to give in this case were not the proper subject of expert testimony. The defense was attempting to elicit a bottom-line opinion as to whether the actions of Gurganus were those of a "depraved mind" or a "premeditated plan." Both of these terms are legal terms with specific legal definitions. Essentially, the defense was attempting to elicit the psychologists' opinions as to whether Gurganus committed second-degree or first-degree murder. Such a conclusion was a legal conclusion no better suited to expert opinion than to lay opinion and, as such, was an issue to be determined solely within the province of the jury.

451 So. 2d at 821.

Consequently, we conclude that under the standard of helpfulness required by Neb. Evid. R. 702, a court may exclude an expert's opinion which is nothing more than an expression of

how the trier of fact should decide a case or what result should be reached on any issue to be resolved by the trier of fact. *See, Karns v. Emerson Elec. Co.*, 817 F.2d 1452 (10th Cir. 1987) (an expert's opinion telling the jury what result to reach is not helpful in deciding a case); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983) (an opinion which contains an expert's view of how the verdict should read and tells the jury what result to reach is properly excluded); *United States v. Ness*, 665 F.2d 248 (8th Cir. 1981) (proper exclusion of an opinion that the defendant did not intend to defraud a bank by misapplication of funds; the opinion was not helpful to the trier of fact); *United States v. Pino*, 606 F.2d 908 (10th Cir. 1979) (forensic psychiatrist's opinion that a defendant's personality prevented the defendant from operating a motor vehicle in a reckless or wanton manner was properly excluded as the expert's substitution of his judgment as to defendant's state of mind); *Stoler v. Penn Central Transp. Co.*, 583 F.2d 896 (6th Cir. 1978) (opinion that a railroad crossing was extrahazardous was properly excluded).

Wigmore, explaining the "theory of the opinion rule," states:

> The true theory, then, of the opinion rule . . . is simply that of the exclusion of supererogatory evidence. It is not that there is any fault to find with the witness himself or the sufficiency of his sources of knowledge or the positiveness of his impression; but simply that his testimony, otherwise unobjectionable, is not needed, is *superfluous.*
>
> . . . .
>
> . . . We are dealing merely with a broad principle that, whenever the point is reached at which the tribunal is being told that which it is itself entirely equipped to determine without the witness' aid on this point, his testimony is superfluous and is to be dispensed with.

(Emphasis in original.) 7 J. Wigmore, Evidence in Trials at Common Law § 1918 at 11-12 (J. Chadbourn rev. 1978).

Thus, when an expert's opinion on a disputed issue is a conclusion which may be deduced equally as well by the trier of fact with sufficient evidence on the issue, the expert's opinion is

superfluous and does not assist the trier in understanding the evidence or determining a factual issue. See, *U.S. v. Felak*, 831 F.2d 794 (8th Cir. 1987) (exclusion of an expert's opinion is proper when there is no basis for the conclusion that the subject was beyond the common understanding of the jurors or that the expert could offer information ordinarily unavailable to the jury); *State v. Saldana*, 324 N.W.2d 227, 229 (Minn. 1982) ("[i]f the jury is in as good a position to reach a decision as the expert, expert testimony would be of little assistance to the jury and should not be admitted"); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) (an expert's testimony may be excluded when the tribunal does not need the witness' judgment, since the judge, or the jury properly instructed by the court, can determine equally well that which the witness would express in an opinion).

In Reynolds' case, we affirm the trial court's exclusion of the psychiatrists' opinions that Reynolds acted without deliberation and premeditation in shooting Craig Dodge. The reasons for upholding the exclusionary ruling are twofold. First, the psychiatric opinions did not relate to Reynolds' ability to effectuate subjective or mental elements for the crime of first degree murder, but, rather, related to factual existence of deliberation and premeditation as elements of first degree murder. In that posture, the psychiatric opinions were expressions that Reynolds was not guilty of the crime charged, murder in the first degree, and, therefore, were unlikely to assist the jury in determining whether Reynolds acted with deliberation and premeditation in shooting Craig Dodge. Second, the psychiatrists had thoroughly supplied the jury with information concerning Reynolds' personality disorders and the personality problems of one who is impulsive, especially the inability to deliberate and premeditate an act by weighing the consequences of the act. After the psychiatrists had evidentially provided the major and minor premises in the syllogism previously mentioned in "Exclusion of the Opinions on 'Deliberate' and 'Premeditate' " of this opinion, the jury was as qualified as the psychiatrists to draw the factual conclusion that Terry Reynolds, as an impulsive person, did not deliberate and premeditate the act of shooting Craig Dodge. Also,

equipped with extensive information supplied by the psychiatrists and other witnesses, the jury was obviously in a position better overall than that of the psychiatrists to determine whether Reynolds actually deliberated and premeditated the act of shooting Dodge. Under the circumstances, we are unable to conclude that the psychiatrists' opinions would have assisted the jury in determining whether Reynolds deliberated and premeditated the act of shooting Craig Dodge. Cf. *Getzschman v. Miller Chemical Co.*, 232 Neb. 885, 443 N.W.2d 260 (1989) (an expert's opinion that a construction bid of $698,000 substantially exceeded the construction project's budget of $350,000 was properly excluded, since the opinion would not assist the jury in determining whether an architect had breached his duty to remain within the project's budget). For the foregoing reasons, the psychiatric opinions about Reynolds' deliberation and premeditation were not information which would have assisted the jury in determining the factual issue of deliberation and premeditation in reference to the Dodge fatality. As we expressed in *State v. Juhl*, 234 Neb. 33, 43, 449 N.W.2d 202, 209 (1989):

> [A] judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

Hence, we find no abuse of discretion in the trial court's exclusion of the psychiatric opinion evidence on deliberation and premeditation in the fatal shooting.

While *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967), supports the general proposition that the sixth amendment prohibits a state from applying an evidential rule which prevents a defendant from presenting a defense based on relevant evidence, the sixth amendment does not make irrelevant evidence admissible and does not render admissible an expert's opinion which does not assist the trier of fact under Neb. Evid. R. 702. See, *Stano v. Dugger*, 883 F.2d 900 (11th Cir. 1989) (the sixth amendment right to present evidence does not

extend to irrelevant evidence); *United States v. Davis*, 772 F.2d 1339 (7th Cir. 1985) (the sixth amendment does not make irrelevant evidence admissible).

Consequently, we find no reversible error in the trial court's exclusion of the psychiatrists' testimony regarding deliberateness and premeditation in Reynolds' act of shooting Craig Dodge.

## INTOXICATION INSTRUCTION

On the issue of Reynolds' intoxication, the trial court used NJI 14.31 for the instruction, whereas Reynolds contends that the trial court erred by refusing his tendered instruction on intoxication.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law; (2) the tendered instruction is warranted by the evidence; and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989); *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 438 N.W.2d 485 (1989).

A defendant's condition of intoxication, otherwise called the defense of intoxication, may negative a subjective or mental element necessary for commission of a crime. As LaFave and Scott observe:

> Intoxication is a defense to crime if it negatives a required element of the crime; and this is so whether the intoxication is voluntary or involuntary.
>
> . . . .
>
> . . . [I]t may be said that it is better, when considering the effect of the defendant's voluntary intoxication upon his criminal liability, to stay away from those misleading concepts of general intent and specific intent. Instead one should ask, first, what intent (or knowledge) if any does the crime in question require; and then, if the crime requires some intent (knowledge), did the defendant in fact entertain such an intent (or, did he in fact know what the crime requires him to know).

1 W. LaFave & A. Scott, Substantive Criminal Law § 4.10 at

551, 554 (West 1986).

Specifically, in reference to intoxication which negatives premeditation and deliberation, LaFave and Scott note:

> Just as intoxication may negative some required intention or knowledge, so too it may negative the premeditation and· deliberation which a common type of first degree murder statute requires. Just as one may be so emotionally upset, or in such a panic, or so mentally abnormal (though not insane), as to be incapable of premeditation and deliberation, so intoxication may rob him of his capacity to premeditate and deliberate and thus reduce his crime from first degree to second degree murder. . . .
>
> Once again, for intoxication to negative premeditation and deliberation it must be so severe as to rob the defendant of his ability to premeditate and deliberate, although it need not in addition be so great as to render him unconscious or to deprive him of his normal ability to know right from wrong.

1 W. LaFave & A. Scott, *supra*, § . 4.10 at 555.

We have acknowledged that "[i]t is clear that NJI 14.31 correctly states the law on the issue of intoxication as a defense." *State v. Donhauser*, 231 Neb. 114, 120, 435 N.W.2d 186, 190 (1989). Consequently, in *State v. Cain*, 223 Neb. 796, 800, 393 N.W.2d 727, 730 (1986), we stated:

> Voluntary intoxication is no justification or excuse for crime unless the intoxication is so excessive that the person is wholly deprived of reason so as to prevent the requisite criminal intent. *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978). Stated another way, voluntary intoxication is ordinarily not a justification or excuse for crime, but excessive intoxication as the result of which a person is wholly deprived of reason may prevent one from having the intent charged. *State v. Bevins*, 187 Neb. 785, 194 N.W.2d 181 (1972); *State v. LaPlante*, 183 Neb. 803, 164 N.W.2d 448 (1969).

See, also, *State v. Lesiak*, 234 Neb. 163, 449 N.W.2d 550 (1989); *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987); *State v. Brown*, 174 Neb. 393, 118 N.W.2d 332 (1962); *Thompson v.*

*State*, 159 Neb. 685, 68 N.W.2d 267 (1955); *Tvrz v. State*, 154 Neb. 641, 48 N.W.2d 761 (1951). Similarly, this court has held that evidence of intoxication may be admissible as a circumstance tending to negative the assertion that a defendant acted with deliberation or premeditation. *State v. Coleman*, 196 Neb. 721, 246 N.W.2d 61 (1976); *State v. Barnes*, 185 Neb. 384, 176 N.W.2d 18 (1970); *State v. Brown, supra*; *Washington v. State*, 165 Neb. 275, 85 N.W.2d 509 (1957); *Tvrz v. State, supra*.

Reynolds asserts: "The jury was positively misled into believing that it could not consider the intoxication evidence for any other purpose than the intoxication defense by its misleading presence in the instruction packet." Brief for cross-appellant at 30. However, Reynolds neither explains nor elaborates on the foregoing conclusory expression. Insofar as deliberation and premeditation are elements in the murder charge against Reynolds, the second paragraph of the court's instruction No. 16 is virtually indistinguishable from Reynolds' tendered instruction, that is, Reynolds' intoxication from consumption of alcohol "should be considered" or "may be considered" by the jury in determining, beyond a reasonable doubt, whether Reynolds acted intentionally and with deliberation and premeditation in shooting Craig Dodge. Reynolds does not point to any particular expression or deficiency in instruction No. 16 which resulted in prejudice to Reynolds and deprived him of a fair trial. For the preceding reasons, Reynolds' assignment of error regarding the trial court's instruction on intoxication is without merit.

## CLAIM OF INSUFFICIENT EVIDENCE

Reynolds states: "Even if this court does not consider the offers of proof of the two expert witnesses concerning Terry Reynolds' failure to deliberate, the evidence is wholly insufficient to warrant a rational factfinder in determinining [sic] that Terry Reynolds [sic] behavior was deliberate at the time he shot Craig Dodge." Brief for cross-appellant at 23.

In determining whether evidence is sufficient to sustain a conviction in a jury trial, the Supreme Court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence

presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict.

*State v. Brown*, 225 Neb. 418, 428, 405 N.W.2d 600, 606 (1987). See, also, *State v. Loveless*, 234 Neb. 463, 451 N.W.2d 692 (1990).

On a claim of insufficiency of evidence, the Supreme Court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.

*State v. Robertson*, 223 Neb. 825, 830, 394 N.W.2d 635, 638 (1986). See, also, *State v. Loveless, supra*.

In light of the evidence previously reflected in this opinion, it is unnecessary to make any comment about Reynolds' claim of insufficient evidence beyond our conclusion that the evidence supports Reynolds' conviction for the first degree murder of Craig Dodge.

CONCLUSION ON REYNOLDS' CROSS-APPEAL

We have considered each of Reynolds' errors assigned in his cross-appeal and conclude that there is no reversible error in Reynolds' convictions. Accordingly, Reynolds' convictions on count I, first degree murder, and count II, using a firearm to commit a felony, are affirmed.

SENTENCING

The trial court requested that a three-judge panel, including the judge who presided at Reynolds' trial, determine the sentence to be imposed on Reynolds' conviction for first degree murder. See § 29-2520 (determination of sentence for a first degree murder conviction). At the sentence hearing before the three-judge panel, evidence was presented relative to the aggravating and mitigating circumstances pertaining to imposition of the death penalty, that is, the circumstances set forth in Neb. Rev. Stat. § 29-2523 (Reissue 1989). As an aggravating circumstance for imposition of the death penalty, § 29-2523(1)(g) provides: "The victim was a law enforcement

officer or a public servant having custody of the offender or another." In finding that § 29-2523(1)(g) did not exist as an aggravating circumstance, the sentencing panel stated:

> The prosecution contends that this aggravating circumstance exists apparently based simply on the fact that the victim was a law enforcement officer, since no evidence exists to show that defendant or another was in custody at the time the crime was committed.
>
> . . . .
>
> The prosecution evidently construes this subsection as providing for two separate aggravating circumstances: 1) the shooting of a law enforcement officer; and 2) the shooting of a public servant having custody of the offender or another.
>
> The panel does not agree with the above construction and finds that the subsection provides for only one aggravating circumstance which requires <u>custody</u> of the offender or another by the law enforcement officer or public servant to be present before this circumstance becomes operative. Since no custody existed in the present case, the panel concludes that (1) (g) does not exist.

The sentencing panel also considered existence of the aggravating circumstance set forth in § 29-2523(1)(h): "The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws." In reference to § 29-2523(1)(h), the sentencing panel concluded:

> The evidence affirmatively shows that the victim was a law enforcement officer responding to a disturbance call in his official capacity. That during the course of the victim's investigation into the facts surrounding the disturbance call, the victim was attempting to gain entrance to the apartment of the defendant in order to conduct a meaningful investigation. The defendant resisted and was physically preventing the victim from entering the apartment by forcing the entrance door closed. During the struggle to keep the victim from entering, the defendant fired the shot that killed the officer, thereby hindering the enforcement of the laws.

However, the sentencing panel determined that three

mitigating circumstances existed in Reynolds' case, namely, § 29-2523(2)(b), which provides that "[t]he offender acted under unusual pressures or influences or under the domination of another person"; § 29-2523(2)(c), which states that "[t]he crime was committed while the offender was under the influence of extreme mental or emotional disturbance"; and § 29-2523(2)(g), which provides that "[a]t the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication." The sentencing panel also determined that there were no "non statutory mitigating circumstances" in Reynolds' case. See *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986) (regarding imposition of the death penalty, a defendant may offer any evidence on the issue of mitigation, even though the mitigating factor is not specifically listed in § 29-2523(2)).

The three-judge panel, concluding that "[s]ufficient aggravating circumstances do not exist to justify the imposition of [the] sentence of death" and "[s]ufficient mitigating circumstances do exist that exceed the weight given any aggravating circumstances," sentenced Reynolds to life imprisonment on his conviction for the first degree murder of Craig Dodge. Later, the judge who had presided at Reynolds' jury trial sentenced Reynolds to 20 years' imprisonment on the firearm conviction, which sentence is to be served consecutively to the life sentence for Dodge's murder.

The State appeals concerning the sentences imposed on Reynolds for both convictions. See § 29-2320. In its brief, the State argues:

> The sentencing panel was wrong, as a matter of law, in concluding that the aggravating circumstance set forth in Neb.Rev.Stat. §29-2523(1)(g) R.R.S. 1943 (Reissue 1985) does not exist. The undisputed evidence was that at the time the defendant killed Craig Dodge, Dodge was on duty as a uniformed deputy sheriff for Lancaster County, Nebraska. The defendant was not in custody at the time of the murder. Because the sentencing panel failed to consider and weigh this key aggravating circumstance, the sentence of life imprisonment was incorrectly imposed,

and is excessively lenient.
Brief for appellant at 3.

When the State, pursuant to § 29-2320, appeals and claims that a sentence imposed on a defendant is excessively lenient, the standard of review is whether the sentencing court abused its discretion in the sentence imposed. *State v. Stastny*, 227 Neb. 748, 419 N.W.2d 873 (1988).

Ordinarily, "[n]o oral argument is allowed in any criminal case . . . [w]here the sole allegation of error is that the sentence imposed was excessive or excessively lenient." Neb. Ct. R. of Prac. 11F(5)b (rev. 1989). However, in view of the nature of the error alleged by the State and the implications regarding application of § 29-2523(1)(g) as an aggravating circumstance for imposition of the death penalty in Nebraska, we have allowed oral argument and now proceed to consider the questions raised by the State.

*Sentence Imposed for First Degree Murder.*

The sentencing panel concluded that an officer's custody of the defendant or another is necessary before § 29-2523(1)(g) becomes operative as an aggravating circumstance for the death penalty. The State suggests that the sentencing panel's

> reading of the statute is contrary to the clear and obvious meaning of the statute, and adds a requirement that was obviously not intended by the Legislature. Section 29-2523(1)(g) reads, "The victim was a law enforcement officer or a public servant having custody of the offender or another." This statute clearly meant to protect law enforcement officers and jailers. It is ridicules [sic] to think that this statute is only designed to protect law enforcement officers if they have someone in custody, and that is not what the statute says.

(Emphasis in original.) Brief for appellant at 4-5. The State concludes that, regarding the aggravating circumstance prescribed in § 29-2523(1)(g), " 'having custody of the offender or another,' refers solely to, 'public servant', and not to, 'law enforcement officer.' " (Emphasis in original.) Brief for appellant at 6.

While the State's preceding interpretation of the statutory

aggravating circumstance in question presents a rather restricted view, limited to the particular factual setting in the present appeal, we are denied the luxury of limitation in the necessary judicial examination of § 29-2523(1)(g) and must consider reasonably probable circumstances beyond the present appeal.

If the State's interpretation prevails, then killing at any time any person who happens to be a law enforcement officer justifies application of § 29-2523(1)(g) as an aggravating circumstance for imposition of the death penalty. In its present form, § 29-2523(1)(g) raises all-too-obvious questions: Must the officer, at the time of the officer's death, be in the performance of an official duty? Must the defendant have known, or should the defendant have reasonably known, that the victim was a law enforcement officer? Without answers to the preceding questions, and perhaps answers to other questions stemming from the absence of definitive statutory language, the State's broad and virtually unrestricted interpretation of § 29-2523(1)(g) may likely raise serious constitutional issues regarding vagueness in § 29-2523(1)(g) or equal protection inherent in the dichotomy of two homicide victims when one victim is a law enforcement officer who is not performing an official duty at the time of death, while the other victim is not a law enforcement officer. There is no legal distinction between the homicide victims reflected in the dichotomy. Yet, in the first part of the dichotomy, one is exposed to the death penalty on account of § 29-2523(1)(g), while, in the second part of the dichotomy, one is not exposed to the death penalty by virtue of § 29-2523(1)(g).

Of the 36 states in which the death penalty is authorized as a punishment for first degree murder, 27 states have chosen to fashion a statutory aggravating circumstance similar to § 29-2523(1)(g), but, unlike Nebraska, the 27 other states have provided a reasonably precise definition, characterization, or description of the law enforcement officer as a victim whose death may be the basis for imposition of the death penalty; for example, see, Ariz. Rev. Stat. Ann. § 13-703F (1989) ("[t]he murdered individual was an on duty peace officer who was killed in the course of performing his official duties and the

defendant knew, or should have known, that the victim was a peace officer"); Colo. Rev. Stat. § 16-11-103(6)(c) (Supp. 1989) ("[t]he defendant knowingly killed [a law enforcement officer] while such person was engaged in the course of the performance of his official duties or in the enforcement of laws, and the defendant knew or reasonably should have known that such victim was such a person engaged in the performance of his official duties or in the enforcement of laws, or the victim was knowingly killed in retaliation for the performance of his official duties or in the enforcement of laws"); Ill. Ann. Stat. ch. 38, para. 9-1(b)1 (Smith-Hurd Supp. 1990) ("the murdered individual was a peace officer . . . killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer"); Ohio Rev. Code Ann. § 2929.04(A)(6) (Anderson 1987) ("[t]he victim of the offense was a peace officer . . . whom the offender had reasonable cause to know or knew to be such, and . . . the victim, at the time of the commission of the offense, was engaged in his duties"). Included in additional states which have a statutory aggravating circumstance for the death penalty based on a defendant's killing a law enforcement officer who is performing an official duty ("duty") or a defendant's killing a law enforcement officer during the officer's performance of an official duty when the defendant knew, or should have known, that the victim was a law enforcement officer ("duty and knowledge") are Delaware—Del. Code Ann. tit. 11, § 4209(e)(1)c (1987) (duty); Florida—Fla. Stat. Ann. § 921.141(5)(j) (West Supp. 1990) (duty); Georgia—Ga. Code Ann. § 17-10-30(b)(8) (1982) (duty); Idaho—Idaho Code § 19-2515(g)(9) (1987) (duty); Indiana—Ind. Code Ann. § 35-50-2-9(b)(6) (Burns Supp. 1990) (duty); Kentucky—Ky. Rev. Stat. Ann. § 532.025(2)(a)7 (Michie Supp. 1988) (duty); Louisiana—La. Code Crim. Proc. Ann. art. 905.4A(2) (West Supp. 1990) (duty); Maryland—Md. Ann. Code art. 27, § 413(d)(1) (1988) (duty); Massachusetts—Mass. Gen. Laws. Ann. ch. 279, § 69(a)(1) (West Supp. 1990) (duty); Missouri—Mo. Ann. Stat. § 565.032 (Vernon Supp. 1990) (duty); Montana—Mont. Code Ann. § 46-18-303(6) (1989) (duty); Nevada—Nev. Rev. Stat. § 200.033(7) (1990) (duty and

knowledge); New Jersey—N.J. Stat. Ann. § 2C:11-3c(4)(h) (West Supp. 1990) (duty); New Mexico—N.M. Stat. Ann. § 31-20A-5 (1987) (duty); North Carolina—N.C. Gen. Stat. § 15A-2000(e)(8) (1988) (duty); Oklahoma—Okla. Stat. Ann. tit. 21, § 701.12(8) (West 1983) (duty); Oregon—Or. Rev. Stat. § 163.095(2)(a)(A) (1989) (duty); Pennsylvania—42 Pa. Cons. Stat. Ann. § 9711(d)(1) (Purdon Supp. 1990) (duty); South Carolina—S.C. Code Ann. § 16-3-20(C)(a)(7) (Law. Co-op. Supp. 1989) (duty); South Dakota—S.D. Codified Laws Ann. § 23A-27A-1(7) (Supp. 1990) (duty); Tennessee—Tenn. Code Ann. § 39-13-203(i)(9) (Supp. 1989) (duty and knowledge); Utah—Utah Code Ann. §§ 76-3-207(2) and 76-5-202(1)(k) (1990) (duty and knowledge); and Washington—Wash. Rev. Code Ann. § 10.95.020(1) (Supp. 1990) (duty and knowledge).

We point out the statutes of other states only to show that killing a law enforcement officer while the officer is lawfully performing an official duty is a fairly common subject for an aggravating circumstance in conjunction with imposition of the death penalty. An aggravating circumstance of such nature has an obvious purpose: "There is a special interest in affording protection to [those] public servants who regularly must risk their lives in order to guard the safety of other persons and property." *Roberts v. Louisiana*, 431 U.S. 633, 636, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977). In other words, as a result of a law enforcement officer's service to the public, many states have determined that murder of a law enforcement officer during the officer's performance of an official duty is an aggravating circumstance in determining whether the death penalty should be imposed.

It appears that the State wishes us to forestall a possible constitutional quandary in § 29-2523(1)(g) by our supplying necessary but omitted qualifying language which accomplishes an acceptable definition or characterization for a law enforcement officer as a victim whose death may provide a basis for imposition of the death penalty in Nebraska. To that end, the State would have us apply the highly questionable rule of statutory construction expressed in *Board of Regents v. Gillette*, 149 Neb. 56, 66, 30 N.W.2d 296, 301 (1947): "The rule is that words may be supplied by the courts in construing a

statute where that is necessary to complete the sense thereof and give effect to the intention of the Legislature manifested therein." We reject the foregoing expression as a valid rule for statutory construction.

In Nebraska, as an apparent attempt at legislative economy, § 29-2523(1)(g) indicates categories of homicide victims, that is, a law enforcement officer and a public servant who has custody of a particular individual. However, without clarifying language to define or sufficiently characterize the officer-victim whose death may be the basis for the aggravating circumstance in question, § 29-2523(1)(g) presents very real and practical problems. Although "[b]revity is the soul of wit," economy of language to the point of verbal paucity in a statute is a dubious hallmark of, and may not be conducive to, constitutionally sound legislation, especially in reference to substantive or procedural due process required in the criminal justice system.

Consequently, we decline to rewrite § 29-2523(1)(g) to conform with the State's wishes and desired interpretation of the statute. The sentencing panel's interpretation of § 29-2523(1)(g) is correct under the circumstances and preserves the statute from constitutional suspicion. Therefore, we affirm the life sentence which the sentencing panel imposed on Reynolds for his conviction of first degree murder.

*Sentence Imposed for Using a Firearm to Commit a Felony.*

The State also claims that Reynolds' sentence of 20 years' imprisonment on the firearm conviction, to be served consecutively to his life sentence for first degree murder, is excessively lenient. Using a firearm to commit a felony is a Class III felony, see § 28-1205(2), and is punishable by a maximum of 20 years' imprisonment, a $25,000 fine, or both, and a minimum of 1 year's imprisonment. See Neb. Rev. Stat. § 28-105(1) (Reissue 1985). The State does not contend that the firearm sentence lies outside statutory limits and does not demonstrate in what manner the firearm sentence is excessively lenient as an abuse of discretion. Bearing in mind our standard of review, see *State v. Stastny*, 227 Neb. 748, 419 N.W.2d 873 (1988), we find no abuse of discretion by the trial court regarding the firearm sentence imposed on Reynolds.

## CONCLUSION

We have considered all assignments of error raised in the State's appeal and Reynolds' cross-appeal. For the reasons previously stated in our consideration of the assignments of error, we affirm Reynolds' conviction and sentence for first degree murder and his conviction and sentence for using a firearm to commit a felony.

AFFIRMED.