STATE OF NEBRASKA, APPELLEE, V. JOHN O. CAIN, APPELLANT.

393 N.W.2d 727

Filed October 3, 1986.   No. 86-232.

Leonard G. Tabor, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

A jury found John O. Cain guilty on each of two counts of knowingly and intentionally distributing, delivering, or dispensing cocaine, a controlled substance pursuant to Neb. Rev. Stat. § 28-405(a)(4) [Schedule II] (Reissue 1985), constituting violations of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1985). He was thereupon so adjudged and sentenced to two concurrent terms of 4 years' probation, with the added conditions that he reimburse the State Patrol Drug Control Cash Fund $450 which was used to make the purchases leading to his arrest, that he agree to searches of his person, automobile, or home without probable cause, and that he serve 90 days in the county jail. The assignments of error discussed in Cain's brief on appeal to this court are that the trial court erred in (1) not finding the evidence insufficient to sustain the verdicts and judgments thereon, (2) overruling a portion of his motion for compulsory process, (3) overruling his motion to call additional witnesses, and (4) imposing excessive sentences. We affirm.

Carey Peterson and Kenny Snyder roomed together during the summer of 1985. During this time, Peterson became acquainted with Cain as the result of accompanying Snyder to Cain's apartment on at least two occasions when Snyder sought to purchase marijuana from Cain. Peterson was later hired by the Nebraska State Patrol as a "cooperating individual" and was so employed during the events described below.

On July 31, 1985, Peterson called Cain from Wyoming, where Peterson was then residing, and arranged to buy 2 grams

of cocaine and an ounce of marijuana. Upon arriving in Scottsbluff on August 1, 1985, Peterson went to the State Patrol office, where he was given $300 and fitted with a body microphone which enabled the monitoring patrolman to hear and record any conversations in which Peterson might participate. Don Blausey, the sergeant in charge of monitoring Peterson, searched Peterson and his car, then followed Peterson to the apartment in which Cain's girlfriend lived.

Peterson went into the apartment, and the conversations which took place within the apartment were monitored and recorded. The tapes recording the conversation were received in evidence and reveal that upon Peterson's arrival Cain commented that Peterson was late, then inquired as to whether he was a narcotics agent. Peterson replied that he was not, after which Cain said, "OK, then I can get you what you want." Cain stated the cost would be $150 a gram, which needed to be paid in cash before he would pick it up. Upon Peterson's hesitation, Cain said if this deal were not made, he would just as soon Peterson not call him any more. Cain also told Peterson not to feel obligated but that he had kept someone waiting from 9 to noon. Peterson then agreed to purchase 2 grams, and everyone left the apartment. As they did so, Peterson said he was going to visit Snyder, and Cain said he would be back in an hour.

Blausey and Peterson met as prearranged, after which Peterson returned to the apartment, reequipped with the microphone. Cain announced that "in 30 minutes it'll be delivered to us." Eventually, an individual identified as Waldo entered the recorded conversation, and Peterson is heard to say something to the effect that he wanted to open it, and followed with "so it doesn't end up spilling on me." Peterson also said that it is "real rocky" and "looks real good."

Peterson then requested a "bill" or a "Bic," according to Cain, to "cut a line." Cain gave Peterson a $20 bill and said, "Don't forget you owe me 20," and "Roll it up. Let's all get high." The four men present then apparently inhaled some of the substance, although Peterson claims he did not actually inhale it but, instead, blew it out on the floor. Shortly before Peterson left the apartment, Cain told Peterson that he would like more time in the future and that Peterson had "better give

[Cain] a jingle." Cain also informed Peterson that he (Cain) did not "do this for a whole lot of people."

Blausey then followed Peterson to their prearranged meeting spot, where Blausey again searched Peterson, and Peterson gave Blausey the two packets he had purchased. Later tests proved the packets to contain cocaine. Peterson never saw the substance in Cain's possession; it was Waldo who handed it to him and who "drew" or "cut" the lines.

On August 26, 1985, Peterson purchased another gram of a substance from Cain. The patrol used the same procedures as on the earlier occasion, except that patrolman Michael Zitterkopf, rather than Blausey, monitored Peterson. The tape recordings of this transaction reveal that Peterson initially telephoned Cain to inquire as to how long it would take Cain "to get it if I come over." Cain replied, "Shouldn't be very long." Peterson, upon arriving at the apartment, decided to "just go for one." Cain left and returned in approximately 45 minutes and gave a substance to Peterson, who examined it before leaving. Subsequent testing proved this substance to also be cocaine.

Cain testified that on August 1, 1985, he had drunk a quart of whiskey. Peterson testified that Cain "was very close to intoxicated" that day but was able to negotiate and understand the transaction. Moreover, according to Peterson, Cain was not noticeably intoxicated during the July 31 telephone conversation. Cain also testified that he would not have sold the cocaine on either occasion if he had not been given the money and asked to provide it.

Kenny Snyder, who has a felony conviction, testified that while he and Peterson were roommates, they both smoked marijuana and took pills which Peterson had obtained and that during this time Cain refused to get drugs for them. Snyder also testified that Peterson once tried to commit suicide and was involved in three automobile accidents. Two of these accidents occurred within 10 minutes of each other after Peterson had smoked marijuana and taken some pills. In the other accident, Peterson rolled his car while traveling at a speed in excess of 100 miles per hour.

Peterson's version, however, was that Snyder, not he,

smoked marijuana while they were roommates. He also denied any suicide attempt, but admitted to rolling his car while going over 100 miles per hour and to one of the other accidents.

Cain's first assignment of error, that the evidence is insufficient to support his convictions, is based on the claims that his intoxication excused his acts, that he was entrapped, and that Peterson's testimony was not corroborated.

Voluntary intoxication is no justification or excuse for crime unless the intoxication is so excessive that the person is wholly deprived of reason so as to prevent the requisite criminal intent. *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978). Stated another way, voluntary intoxication is ordinarily not a justification or excuse for crime, but excessive intoxication as the result of which a person is wholly deprived of reason may prevent one from having the intent charged. *State v. Bevins*, 187 Neb. 785, 194 N.W.2d 181 (1972); *State v. LaPlante*, 183 Neb. 803, 164 N.W.2d 448 (1969).

The evidence presented at trial, particularly the tape recordings of the two transactions, clearly establishes that Cain possessed the ability to reason and understand what was occurring. Cain effectively negotiated the terms of the sale and left the apartment in both instances to acquire the cocaine. His intoxication does not approach the level necessary to furnish a defense.

Cain's entrapment contention is equally meritless. It is the origin of the intent to commit the crime which determines whether entrapment has taken place. *State v. Swenson*, 217 Neb. 820, 352 N.W.2d 149 (1984). If the intent to commit the crime charged originated with the government rather than the defendant, the defendant was entrapped. Thus, in order to substantiate the defense of entrapment, the defendant must show that (1) the government induced the defendant to commit the offense charged and (2) the defendant was not otherwise ready and willing to commit the offense on any propitious opportunity. In other words, for entrapment to take place the defendant must not have been predisposed to commit the crime, and the government must have improperly induced the defendant to commit the crime. *State v. Pearson*, 220 Neb. 183, 368 N.W.2d 804 (1985); *State v. Swenson, supra.* Accord,

*Hampton v. United States*, 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973); *Sorrells v. United States*, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 413 (1932).

The evidence establishes beyond a reasonable doubt that Cain was ready and willing to sell cocaine to Peterson on each of the two occasions in question. Cain's August 1 statements, that he had had someone waiting for Peterson's arrival, that if that sale were not made, he would rather not be bothered in the future, and that in the future he would have to have more time, are not the words of an innocent induced by the government into perpetrating a criminal act he was not otherwise predisposed to commit. The fact that the government, through Peterson, provided Cain with a favorable opportunity to do that which Cain was otherwise ready and willing to accomplish does not constitute entrapment. *State v. Beckner*, 211 Neb. 442, 318 N.W.2d 889 (1982); *State v. Swenson, supra.*

The last issue in connection with this first assignment of error rests upon the language of Neb. Rev. Stat. § 28-1439.01 (Reissue 1985), which states: "No conviction for an offense punishable under sections 28-401 to 28-438 shall be based solely upon the uncorroborated testimony of a cooperating individual." As *Beckner* pointed out, however, it is only required "that a conviction be based on something more than only a cooperating individual's testimony." 211 Neb. at 446, 318 N.W.2d at 892. It is sufficient if the cooperating individual is corroborated as to material facts and circumstances which tend to support the testimony as to the principal fact in issue.

It is ludicrous to suggest that the tapes recording the conversations and transactions between Cain and Peterson and the testimony of the two police officers who observed Peterson do not furnish the necessary corroboration. There is therefore no merit to Cain's first assignment of error.

The second assignment of error concerns itself with the fact that while the trial court granted Cain's request for compulsory process to enforce the attendance of witnesses who were expected to testify as to their own personal knowledge of the purchases involved in this case, it denied the request to the extent it sought the attendance of witnesses who were expected

to testify as to Peterson's drug use on other occasions.

The relevant portion of Neb. Rev. Stat. § 29-1903 (Reissue 1985) provides: "Any person accused of crime amounting to felony shall have compulsory process to enforce the attendance of witnesses in his or her behalf . . . ."

In *State v. Rayes*, 218 Neb. 588, 357 N.W.2d 222 (1984), this court noted that the sixth amendment to the U.S. Constitution guarantees to a defendant " 'compulsory process for obtaining *witnesses in his favor*' " and that a defendant may not be arbitrarily deprived of testimony that would have been relevant, material, and vital to the defense. *Id.* at 590, 357 N.W.2d at 223. However, the defendant must at least make some plausible showing of how an absent witness' testimony would have been both material and favorable to his defense. Accordingly, the *Rayes* court affirmed the trial court's determination not to allow testimony concerning what tests could have been, but were not, made on a knife to determine whether the defendant's body secretions were on it or whether defendant's clothing contained filings from the knife. The court noted: "[A]ll that could be deduced from that testimony would be that if tests had been run, they would either have shown that the defendant had the knife on his person or that *perhaps* he did not." *Id.* Such testimony would have lacked relevancy.

In *O'Rourke v. State*, 166 Neb. 866, 90 N.W.2d 820 (1958), this court stated that a court may refuse to permit issuance of a subpoena until it has been demonstrated what testimony may be expected of the prospective witnesses. The constitutional right to compulsory process requires process only for competent and material witnesses. This court, in affirming the trial court's denial of compulsory process, noted that the only reason for the witnesses' testimony was to indicate the type of treatment the defendant received while incarcerated. Such was irrelevant and immaterial to the defendant's escape charge.

*United States v. Bernhardt*, 642 F.2d 251 (8th Cir. 1981), likewise states that "[i]t is only where the trial court excludes relevant evidence without sufficient justification that a defendant's right to compulsory process is violated." *Id.* at 253.

Even if the testimony as to Peterson's use of drugs on other occasions would have been relevant, a matter we do not decide, the evidence as to Cain's guilt was otherwise so overwhelming

that the refusal to grant compulsory process as to these particular witnesses was, if error, harmless beyond a reasonable doubt. Error which does not prejudice a criminal defendant does not form a basis for overturning an otherwise correct conviction. *State v. Birge*, 215 Neb. 761, 340 N.W.2d 434 (1983); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

The third assignment of error rests upon the trial court's refusal to permit Cain to call two rebuttal witnesses not named in the pretrial order. However, the record contains no showing as to the expected content of these witnesses' testimony. As the foregoing discussion of the law applicable to the preceding assignment demonstrates, the refusal to permit witnesses to testify cannot form the basis for error unless it is shown that what the prospective witness had to say was relevant, competent, and favorable to the defendant. There is therefore no merit to this assignment of error.

In his last assignment of error Cain makes no attack on any particular condition of his probation but, rather, generally wails about his fate and urges that, since his only prior conviction was for an intoxication offense in 1980, the sentences imposed are too severe.

We conclude otherwise. Cain is 28 years old and has a ninth grade education, but has not maintained any type of permanent full-time employment since 1982. The evidence demonstrates that Cain engaged in the illegal and doomful business of selling destructive substances. Under the applicable statutory scheme, the offenses of which he was convicted are Class II felonies punishable by a term of imprisonment for up to 50 years. § 28-416(2)(a) and Neb. Rev. Stat. § 28-105 (Reissue 1985).

The sentences imposed are clearly within the statutory limits. As so often stated, this court will not, absent an abuse of discretion on the part of the trial court, modify a sentence imposed within statutory limits. *State v. Nearhood, ante* p. 768, 393 N.W.2d 530 (1986); *State v. Clayburn, ante* p. 333, 389 N.W.2d 314 (1986). Under the circumstances it cannot be said the trial court abused its discretion in sentencing Cain as it did.

None of Cain's assignments of error being supported by the record, the judgment and sentences of the trial court are affirmed.

AFFIRMED.