STATE OF NEBRASKA, APPELLEE, V. STEVEN M. CONNELY, APPELLANT.

499 N.W.2d 65

Filed April 23, 1993.   No. S-92-761.

320

David W. Jorgensen, of Nye, Hervert, Jorgensen & Watson, P.C., for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to verdict, the defendant-appellant, Steven M. Connely, was adjudged guilty on each of two counts of dispensing or delivering an anabolic steroid, in violation of Neb. Rev. Stat. §§ 28-446 and 28-447 (Cum. Supp. 1990), and was thereafter sentenced. Upon Connely's appeal, the district court affirmed the judgment of the county court. Connely now asserts that the district court erred in failing to find that the county court erred on the record by its failure to find that (1) §§ 28-446 and 28-447 are unconstitutionally vague, (2) he was unlawfully entrapped, and (3) the evidence is insufficient to support the conviction. We affirm.

## II. FACTS

Connely was a college criminal justice major aspiring to gain employment in one of a variety of federal law enforcement agencies. In October 1990, he researched using steroids because of a demanding schedule and his desire to prepare to join the Drug Enforcement Administration. He purchased books on the subject, including one entitled "Anabolic Reference Guide." After reading these materials, Connely decided to try a short cycle of 8 weeks of use of the oral steroid methyltestosterone. Failing to attain the results he had wanted, he discontinued

taking the substance in February 1991.

After receiving information about the possible sale of anabolic steroids at a college campus, a police investigator, on April 2, 1991, contacted a confidential informant who was enrolled in a course with Connely, a person who had been called to the investigator's attention as a possible seller. According to the informant, he, at approximately 4 p.m., went to Connely's campus dormitory and approached Connely about purchasing some steroids. The informant asserts he claimed he was "getting into lifting" and "wanted to get big." However, Connely disputes this, testifying that the informant spoke only of a desire to lose weight and of wanting to get in shape for an upcoming sheriff's physical fitness test.

Connely told the informant that he did not know if he could find any steroids at that time and asked what kind of steroid the informant wanted. The informant replied that he did not know anything about them. Reading out of a reference guide describing the substance, Connely began listing different types of steroids. The informant initially asked for "pill form steroids," but Connely told him that they were hard to find and were not as effective as injectable-form steroids.

According to the informant, Connely then called someone on the telephone and left a message on an answering machine, explaining that he had someone wishing to purchase steroids and asking that the call be returned. Shortly thereafter, the telephone rang. Connely told the informant that the person on the telephone had some steroids and began quoting prices. Connely asked the informant how much he wished to spend, passed the information on to the individual on the telephone, and checked back with the informant to see if the price was satisfactory.

After Connely hung up the telephone, he told the informant to call later that evening if the informant still wanted the steroids. Connely told the informant that since the informant was from "in town," thus obviating any travel expenses, Connely would not charge overhead and would give the steroids to the informant for what Connely's dealer was getting for them. Connely also spoke of the price inflation in steroids and of counterfeit steroids on the market, telling the informant that

Connely was doing the informant a favor. The informant later received a message on his telephone answering machine from Connely and arranged to meet Connely on April 4, 1991, at approximately 4 p.m.

On April 4, the informant again went to Connely's dormitory room to purchase the steroids. Connely showed the informant how to tell if a box of steroids had been tampered with and instructed the informant to tear off the labels and dispose of them so that the lot numbers could not be traced. Connely also explained how the informant should use the steroids, how frequently, where to inject them, what types of needles to buy, and where to buy needles. The informant purchased three boxes of steroids from Connely, which Connely said would last 9 months.

Sometime thereafter, the informant told Connely that he was on antibiotics and asked if the steroids would still help him. Connely advised the informant not to take the steroids.

The informant again telephoned Connely on May 29, 1991. During this telephone conversation, the informant told Connely that since the informant had been sick and was using antibiotics and because he needed the money, the informant had sold the steroids he had purchased to a friend. The informant then told Connely that he was feeling better now and wished to buy some more steroids.

Connely told the informant that the steroids he was providing on this occasion were much better than those which he had sold him on April 4, explaining that the new steroids had to be mixed and that they were to be administered in the buttocks. Connely told the informant that the cost would be $160, that the new steroids would probably go fast, and that if the informant did not want them, he had two other individuals who were interested in purchasing them. However, Connely testified that he was referring to the fact that his friend had told him he had two other people who were interested in the steroids. The informant told Connely that he would buy the new steroids, and Connely replied that he would tell the other individuals that the steroids were not for sale. The informant then arranged for another purchase to take place at approximately 6:30 p.m. the same evening.

On this occasion, Connely again explained, reading from the reference guide, why the new steroids were better than the type he previously had sold to the informant. Connely again told the informant that he should dispose of the tops of the boxes so that the lot numbers could not be traced. The informant purchased three bottles of anabolic steroids. Connely wanted the informant to purchase a fourth bottle, but the informant explained that he did not have enough money with him. Connely told him to contact him within 2 weeks if he wanted the fourth bottle or it would be gone.

Connely was then placed under arrest by another police investigator. Meanwhile, the first investigator obtained a search warrant for Connely's residence. Discovered during the search was a book entitled "Anabolic Reference Guide" and the $160 the informant had given Connely.

The parties stipulated that the substance contained in the two purchases made by the informant were the controlled substance steroid testosterone, as defined in § 28-446 and Neb. Rev. Stat. § 28-405(d)(26) [Schedule III] (Cum. Supp. 1992).

## III. ANALYSIS

### 1. CLAIM OF VAGUENESS

Connely begins by claiming that §§ 28-446 and 28-447 are so vague that they do not apprise him of the proscribed conduct, thus depriving him of the constitutionally required due process of law. Specifically, he asserts that §§ 28-446 and 28-447 are vague because they make "the delivery of anabolic steroids illegal, not upon an actor's actual delivery or his intent in making the delivery but rather how the ultimate user uses the steroid." Brief for appellant at 11. Next, he contends the two statutes are vague because they fail to define "valid medical purpose." *Id*.

In order to have standing to assert a claim of vagueness, Connely must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others. See, *State v. Pierson*, 239 Neb. 350, 476 N.W.2d 544 (1991); *State v. Burke*, 225 Neb. 625, 408 N.W.2d 239 (1987); *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). However, Connely is

entitled to show that the statutes, when applied to his particular conduct, are vague. See *State v. Copple, supra*.

Adopted in 1990 Neb. Laws, L.B. 571, effective July 10, 1990, §§ 28-446 and 28-447 were repealed in 1992 and incorporated into § 28-405 and Neb. Rev. Stat. §§ 28-401 and 28-404 (Cum. Supp. 1992). 1992 Neb. Laws, L.B. 1019.

The relevant portions of § 28-447 provided: "(2) No person shall: (a) Prescribe, dispense, deliver, or administer an anabolic steroid or deliver a prescription form for an anabolic steroid to a person for human use for any purpose other than a valid medical purpose and in the course of professional practice."

Section 28-446 declared that for purposes of § 28-447, an anabolic steroid was one of seventeen specific compounds, including testosterone, "or any isomer, ester, salt, or derivative of the following that acts in the same manner on the human body except when in the form of a livestock implant." Section 28-446 further stated:

> (2) The use of an anabolic steroid for the purpose of hormonal manipulation that is intended to increase muscle mass, strength, or weight without a medical necessity to do so or for the intended purpose of improving physical appearance or performance in any form of exercise, sport, or game shall not be a valid medical purpose or in the course of professional practice.

A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *State v. Garza*, 242 Neb. 573, 496 N.W.2d 448 (1993); *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992). Thus, before a court can declare a statute unconstitutional, its unconstitutionality must be clearly demonstrated, *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990), and *State v. Copple, supra*, and the burden to do so rests upon the party making the claim of unconstitutionality, *State v. Garza, supra*; *State v. Sexton, supra*; *State v. Crowdell, supra*.

> The test for determining whether a statute is vague is whether it forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . . A statute will not be deemed vague if it

uses ordinary terms which find adequate interpretation in common usage and understanding. . . . In determining whether a statute is vague and therefore does not give a defendant adequate notice that his conduct is proscribed, the statute must be examined in light of the conduct with which the defendant is charged. . . .

. . . The prohibition against vagueness does not invalidate a statute simply because it could have been drafted with greater precision. The test is whether the defendant could reasonably understand that his conduct was proscribed by the statute.

(Citations omitted.) *State v. Sprague*, 213 Neb. 581, 587-88, 330 N.W.2d 739, 744 (1983). Accord, *State v. Scott*, 225 Neb. 146, 403 N.W.2d 351 (1987); *State v. Copple, supra*; *State v. Sailors*, 217 Neb. 693, 352 N.W.2d 860 (1984).

### (a) Nature of Requisite Intent

Connely's first claim of vagueness, that §§ 28-446 and 28-447 make conduct illegal based not on the intent with which a steroid is delivered but on the use made of it, mirrors an unsuccessful argument scrutinized in cases involving drug paraphernalia legislation. *Casbah, Inc. v. Thone*, 651 F.2d 551 (8th Cir. 1981), *cert. denied* 455 U.S. 1005, 102 S. Ct. 1642, 71 L. Ed. 2d 874 (1982), *reh'g denied* 456 U.S. 950, 102 S. Ct. 2023, 72 L. Ed. 2d 476.

Relevant to this inquiry was the assertion in *Casbah, Inc.* that the definition of drug paraphernalia as including " 'all equipment, products, and materials of any kind *intended for use*' " with controlled substances was impermissibly vague. (Emphasis in original.) *Casbah, Inc. v. Thone*, 651 F.2d at 559. Much like Connely, the *Casbah, Inc.* appellants argued that the statute there in question would permit prosecution of an innocent seller if the item was intended by a buyer for use with controlled substances.

In finding the paraphernalia statute to be constitutionally valid, the U.S. Court of Appeals for the Eighth Circuit declared:

A fair reading of the statute *as a whole* indicates that the intent referred to is that of the person alleged to have

violated the statute. What seems at first glance to be a deficiency in draftsmanship is explained by the fact that the definitional section is intended to draw four categories of persons (manufacturers, wholesalers, retailers and purchasers) within the reach of the legislation. Sections 3 and 4, in defining substantive offenses, provide clarity by linking the requirement of intent with the person whose activity is forbidden: "It shall be unlawful for any person to use, or to possess with intent to use, drug paraphernalia. [Section 3.] It shall be unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver, drug paraphernalia. [Section 4.]" In sum, the Nebraska statute adequately defines the mental state required to render an item drug paraphernalia and refers to the intent of the person charged with violation.

(Emphasis in original.) *Casbah, Inc. v. Thone*, 651 F.2d at 559. See *Delaware Accessories Trade Ass'n v. Gebelein*, 497 F. Supp. 289 (D. Del. 1980). But see *Gaffey v. Babb*, 50 Or. App. 617, 624 P.2d 616 (1981), *review denied* 291 Or. 117, 631 P.2d 341.

Here, a careful reading of §§ 28-446 and 28-447 in toto reveals that contrary to Connely's contention, the State must show that an accused dispensed or delivered an anabolic steroid intending that the substance would be employed in a human use other than for a valid medical purpose and in the course of professional practice. Only items meeting the statutory definition and being possessed with the requisite mental state fall within the prohibitions of the statutes. See *State v. Two IGT Video Poker Games*, 237 Neb. 145, 465 N.W.2d 453 (1991). Thus, it is immaterial whether the person to whom the steroids were dispensed or delivered had the intent to use them for human use other than for a valid medical purpose and in the course of professional practice. Indeed, there is no requirement whatsoever to show that the person to whom the steroids were delivered actually used them. Because the aforementioned sections are not impermissibly vague, and sufficient facts can be gleaned from the record to indicate Connely possessed the requisite intent, this claim of vagueness is without merit.

### (b) Nature of Use for Which Delivered

Connely's second claim of vagueness, that §§ 28-446 and 28-447 fail to define "valid medical purpose," ignores the language of § 28-446(2), set forth earlier.

Although §§ 28-446 and 28-447 are certainly not models of clarity, the prohibition against vagueness does not invalidate a statute simply because it could have been drafted with greater precision. The test is whether a defendant could reasonably understand that his or her conduct was proscribed by the statute. Section 28-446(2) makes it abundantly clear that the use of an anabolic steroid with the intended purpose of increasing muscle mass or strength without a medical necessity is not a valid medical purpose. Section 28-447 states that it is a crime to dispense or deliver an anabolic steroid for human use for any purpose other than a valid medical purpose. These sections, as applied to the conduct at issue, are not so vague that persons of common intelligence must guess at their meaning and thus differ as to their application.

### 2. CLAIM OF ENTRAPMENT

In making his next claim, that he was unlawfully entrapped, Connely relies solely on the holding in *Jacobson v. U.S.*, ___ U.S. ___, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). Therein, the U.S. Supreme Court reversed the defendant's conviction of receiving child pornography through the mails. Government officials had discovered the defendant's name on the mailing list of a so-called adult bookstore from which he legally ordered two magazines and a brochure depicting nude children. Shortly after the defendant's legal purchase, Congress enacted the Child Protection Act of 1984, making such purchases illegal. Over a period of the ensuing $2^1/_2$ years, there occurred "repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore [defendant's] willingness to break the new law by ordering sexually explicit photographs of children through the mail." 112 S. Ct. at 1538.

The *Jacobson* Court ruled that the defendant's conviction could not stand because the "Government did not prove that [the defendant's] predisposition was independent and not the

product of the attention that the Government had directed at [the defendant over a 2¹/₂-year period]." 112 S. Ct. at 1541. The five-justice majority announced that "[w]here the Government has induced an individual to break the law and the defense of entrapment is at issue . . . the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act *prior to first being approached by Government agents*." (Emphasis supplied.) 112 S. Ct. at 1540.

A dissenting opinion authored by Justice O'Connor found this rule to be somewhat troubling:

> Today, the Court holds that Government conduct may be considered to create a predisposition to commit a crime, even before any Government action to induce the commission of the crime. In my view, this holding changes entrapment doctrine. Generally, the inquiry is whether a suspect is predisposed before the Government induces the commission of the crime, not before the Government makes initial contact with him.

112 S. Ct. at 1545. Furthermore, the dissent prophesied how the majority opinion would be read by relief-seeking defendants:

> The rule that preliminary Government contact can create a predisposition has the potential to be misread by lower courts as well as criminal investigators as requiring that the Government must have sufficient evidence of a defendant's predisposition *before it ever seeks to contact him*. Surely the Court cannot intend to impose such a requirement, for it would mean that the Government must have a reasonable suspicion of criminal activity before it begins an investigation, a condition that we have never before imposed. The Court denies that its new rule will affect run-of-the-mill sting operations . . . and one hopes that it means what it says. Nonetheless, after this case, every defendant will claim that something the Government agent did before soliciting the crime "created" a predisposition that was not there before.

(Emphasis in original.) 112 S. Ct. at 1545.

While it appears that most courts have found *Jacobson* to rest on the egregiousness of its factual setting, see, e.g., *U.S. v. Martinez*, 979 F.2d 1424 (10th Cir. 1992), *cert. denied* _____

U.S. _____, 113 S. Ct. 1824, 123 L. Ed. 2d 454 (1993), and *U.S. v. LaChapelle*, 969 F.2d 632 (8th Cir. 1992), at least two courts, both of which utilize a subjective test for determining the presence of entrapment, have read *Jacobson* as refining the entrapment standard and, because the entrapment standard is not of constitutional dimension, have refused to change their law. See, *Rivera v. State*, 846 P.2d 1 (Wyo. 1993); *State v. Delisio*, No. 91-CA-46, 1992 WL 213451 (Ohio App. Sept. 3, 1992) (unpublished opinion).

While we agree that *Jacobson* can be distinguished on the outrageousness of the government's conduct, we are persuaded by the recent holding in *U.S. v. Kussmaul*, 987 F.2d 345 (6th Cir. 1993), that *Jacobson* did not revolutionize the law of entrapment. Therein, the U.S. Court of Appeals for the Sixth Circuit, in reaffirming that for the purposes of the entrapment defense the government must prove beyond a reasonable doubt that the predisposition to commit the crime existed prior to and independent of the government's contact, rejected the notion that proof of the predisposition be obtained prior to the government's initial contact with the target of a sting operation. See, also, *State v. DeAngelo*, 113 Or. App. 192, 830 P.2d 630 (1992), *review denied* 314 Or. 391, 840 P.2d 709 (*Jacobson* does not require that government have reasonable suspicion of wrongdoing before it may afford opportunities for commission of offense). Accordingly, we need not deviate from our established test for entrapment.

We have defined entrapment as "the governmental inducement of one to commit a crime not contemplated by the individual, in order to prosecute that individual for the commission of the criminal offense." *State v. Stahl*, 240 Neb. 501, 510, 482 N.W.2d 829, 838 (1992), citing *State v. Jones*, 231 Neb. 47, 435 N.W.2d 167 (1989). Entrapment occurs when the criminal intent or design originates with governmental officials who implant in the mind of an innocent person the disposition to commit a criminal offense and induce criminal conduct in order to prosecute the criminal offense so induced. *State v. Van Egmond*, 233 Neb. 834, 448 N.W.2d 569 (1989); *State v. Byrd*, 231 Neb. 231, 435 N.W.2d 898 (1989). See *Sorrells v. United*

*States*, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 413 (1932). Where a person has no previous intent or purpose to violate the law, but does so only because he is induced to commit the act by law enforcement officers or agents, he is entitled to the defense of entrapment. *State v. Van Egmond, supra*; *State v. Jones, supra*.

Using the "origin of intent" test to determine whether a defendant was in fact entrapped, we have declared that entrapment consists of two elements: (1) government inducement of the defendant to commit the offense charged and (2) a defendant's predisposition to commit the criminal act was such that he was not otherwise ready and willing to commit the offense on any propitious opportunity. *State v. Stahl, supra*; *State v. Van Egmond, supra*; *State v. Byrd, supra*; *State v. Jones, supra*; *State v. Swenson*, 217 Neb. 820, 352 N.W.2d 149 (1984). In the "origin of intent" test, the ultimate focus is on the defendant's predisposition to commit the crime for which the State prosecutes. *State v. Stahl, supra*; *State v. Byrd, supra*; *State v. Swenson, supra*. If the jury finds that the defendant was predisposed to commit the crime, a defense of entrapment must fail. *State v. Stahl, supra*; 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.2 (1986).

Entrapment is in the nature of an affirmative defense, and thus the burden of going forward with evidence of governmental inducement is on the defendant. *State v. Stahl, supra*; *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982); *State v. Ransburg*, 181 Neb. 352, 148 N.W.2d 324 (1967). Cf. *State v. Swenson*, 217 Neb. at 824, 352 N.W.2d at 153 ("[e]ntrapment is an affirmative defense"). When the defendant produces sufficient evidence to raise the defense, the question of entrapment becomes one of fact for the jury. *State v. Stahl, supra*; *State v. Parks, supra*. The burden is on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *State v. Stahl, supra*; *State v. Van Egmond, supra*.

When reviewing jury verdicts regarding the defense of entrapment, an appellate court will disturb the jury's findings only when the preponderance of evidence against such findings is great and they clearly appear to be wrong, or when the findings are clearly contrary to law. In other words, we must sustain the jury's verdict if, taking the view most favorable to

the State, there is evidence in the record to support it. *State v. Stahl, supra*; *State v. Parks, supra*.

The evidence establishes beyond a reasonable doubt that Connely was ready and willing to sell steroids to the informant on each of the two occasions in question. Although the informant never witnessed other sales, Connely told the informant that he, Connely, had sold steroids to other individuals. Furthermore, Connely had no difficulty in finding steroids to sell to the informant. We have written that "[r]eady access to illicit drugs is a legitimate factor for the jury to consider on the question of predisposition." *State v. Stahl*, 240 Neb. 501, 511, 482 N.W.2d 829, 838 (1992). While we recognize that the mere possession of steroids is not illegal, for the drugs have many lawful uses, Connely's knowledge of steroid sale practices and his command of the steroid vernacular uses went to the issue of predisposition, for, as we have observed, "[a] familiarity with and demonstrable orientation to the relevant activity also constitutes relevant evidence of predisposition." *Id*. Moreover, Connely's acts of informing the confidential informant of the price range of steroids and setting the price for the steroids the informant eventually purchased go to predisposition. See *State v. Van Egmond*, 233 Neb. 834, 448 N.W.2d 569 (1989).

Contrary to Connely's belief, the fact that the government, through the confidential informant, provided Connely with a favorable opportunity to do that which Connely was otherwise ready and willing to accomplish does not constitute entrapment. *State v. Cain*, 223 Neb. 796, 393 N.W.2d 727 (1986).

Connely also points out that he delivered the steroids only after requested by the confidential informant. However, we have previously declared that

> law enforcement officers are not precluded from utilizing artifice and stratagem, such as the use of decoys or undercover agents, to apprehend a person engaged in a criminal enterprise, provided that they merely afford opportunities or facilities for the commission of an offense by one already predisposed or ready to commit it.

*State v. Lampone*, 205 Neb. 325, 328, 287 N.W.2d 442, 444

(1980). Accord, *State v. Stahl, supra*; *State v. Van Egmond, supra*. See *Jacobson v. U.S.*, ____ U.S. ____, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). The State, through its use of a confidential informant, did not overstep the boundary between setting a trap for the " 'unwary innocent' " and the " 'unwary criminal.' " 112 S. Ct. at 1537, quoting *Sherman v. United States*, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958).

Connely also contends that from the middle of February to early April, the informant asked him "a minimum of 12 to 25" times for steroids. Obviously, overpersuasion, undue pressure, or coercion may indicate a reluctance or unwillingness on the part of the defendant to participate in the proposed criminal activity and thus a lack of predisposition. *State v. Stahl, supra*; *State v. Gurule*, 194 Neb. 618, 234 N.W.2d 603 (1975). However, the confidential informant denied having approached Connely this number of times; the jury was entitled to believe whomever it chose.

### 3. CLAIM OF INSUFFICIENCY OF EVIDENCE

Finally, Connely asserts the evidence is insufficient to support his conviction. As we have frequently stated, in determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Hernandez*, 242 Neb. 78, 493 N.W.2d 181 (1992); *State v. Vance*, 240 Neb. 794, 484 N.W.2d 453 (1992); *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991).

The evidence, viewed in a light most favorable to the State, establishes that on April 4 and May 29, 1991, Connely delivered

anabolic steroids, as defined in § 28-446, to the confidential informant for human use and for other than a valid medical purpose and in the course of professional practice. This is the very conduct proscribed by § 28-447.

### IV. JUDGMENT

The record failing to sustain any of Connely's assignments of error, the judgment of the district court is affirmed.

AFFIRMED.