STATE OF NEBRASKA, APPELLEE,
V. MICHAEL MEEHAN, APPELLANT.
576 N.W. 2d 483

Filed March 10, 1998. No. A-97-361.

Richard K. Watts, of Mills, Watts & Nicolas, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and SIEVERS, Judges.

MILLER-LERMAN, Chief Judge.

Following a bench trial, Michael Meehan appeals from his convictions and sentences imposed by the district court for York County. For the reasons recited below, we affirm Meehan's convictions for delivery of a controlled substance, bribery of a witness, and tampering with a witness. We reverse his conviction for subornation of perjury. We affirm Meehan's sentences, as modified.

## PROCEDURAL BACKGROUND

On June 5, 1996, Meehan was charged by information with the following: count I, delivery of a controlled substance, in violation of Neb. Rev. Stat. § 28-416 (Reissue 1995), a Class III felony; count II, conspiracy to deliver a controlled substance, in violation of Neb. Rev. Stat. § 28-202 (Reissue 1995) and § 28-416, a Class III felony; count III, bribery of a witness, in violation of Neb. Rev. Stat. § 28-918 (Reissue 1995), a Class IV felony; count IV, tampering with a witness, in violation of Neb. Rev. Stat. § 28-919 (Reissue 1995), a Class IV felony; count V, subornation of perjury, in violation of Neb. Rev. Stat. § 28-915 (Reissue 1995), a Class III felony; and count VI, theft by deception in an amount of more than $200 but less than $500, in violation of Neb. Rev. Stat. § 28-512 (Reissue 1995), a Class I misdemeanor. Meehan pled not guilty to the charges.

On August 21, 1996, Meehan moved for an order electing separate trials on various counts. Ultimately, two bench trials were had in this case: one trial, held September 11 and 12,

1996, on counts I and II; and one trial, held on February 5 and 6, 1997, on counts III through V. Meehan was convicted of counts I, III, IV, and V and appeals his convictions and sentences therefrom. Counts II and VI were dismissed and are not the subject of this appeal.

## FACTUAL BACKGROUND

*Delivery of Controlled Substance.*

Carla Schreiber has been employed as a narcotics officer with the Nebraska State Patrol since July 1994, working with various undercover operations in rural areas in Nebraska. Prior to meeting Meehan, Schreiber had received information from local law enforcement officers regarding Meehan's involvement with drugs. Schreiber testified that she first met Meehan on October 18, 1994, when she went to Meehan's residence in Waco, Nebraska, with a confidential informant, Terry Edmunds, to purchase methamphetamine. No sale of methamphetamine took place at this time.

Schreiber next met with Meehan at his residence on October 24, 1994, and asked him about the possibility of "finding me some stuff." Schreiber testified that Meehan asked her if, when she talked about "stuff," she was referring to crank. When Schreiber stated that that was correct, Meehan indicated that he was "supposed to get an eight ball but only got two grams. That he also thought he had a quarter coming." Schreiber explained that an "eight ball" was an eighth of an ounce of methamphetamine and a "quarter" is a quarter of a gram of methamphetamine. Schreiber stated that these were terms commonly referred to by persons involved in drug trafficking. Schreiber did not obtain drugs from Meehan at this time.

Schreiber again met with Meehan at his residence on November 4, 1994, at which time Meehan told Schreiber that he thought he could get her something. Schreiber could not recall who first brought up the subject of drugs at this meeting.

On the evening of November 9, 1994, Schreiber stopped by Meehan's residence but discovered that he was not home. Because Schreiber was aware that Meehan frequented Hunter's Lounge, she went there to see if she might find Meehan. Meehan eventually arrived at the lounge and approached

Schreiber, who was at the bar. Schreiber testified that during their conversation Meehan stated that he had gotten a quarter the previous night and then spoke of also getting an eight ball, of which there were a few grams left. Meehan also told Schreiber that he might be receiving some methamphetamine later that evening from some people in York, Nebraska. Schreiber testified that they discussed fronting money for narcotics and talked about a "residence [sic]" in McCool Junction, Nebraska, being a supplier of cocaine. Schreiber said that Meehan talked about being uncomfortable dealing with anyone that he had not known for 10 years, a statement which Schreiber described as having been made during a conversation about delivering methamphetamine to her or to other individuals. She said that Meehan asked about going through Edmunds if Meehan felt uncomfortable about delivering to Schreiber. Schreiber said that the two conversed for about 2 hours, during which time she brought up the subject of Meehan's obtaining methamphetamine once or twice. Schreiber acknowledged that she told Meehan that she was working on her house and needed "motivation." Schreiber stated that Meehan may have brought up the subject of obtaining the drug numerous times during their conversation.

Later that evening, after the two had left the lounge, Schreiber arrived at Meehan's home. Schreiber testified that Meehan opened the door and said, "I got two lines together, I scraped some bags," and indicated that Schreiber should follow him up the stairs. Schreiber explained that "two lines" referred to two lines of methamphetamine and that "scraped some bags" meant that Meehan had scraped the residue from bags that had contained methamphetamine in the past. Schreiber stated that there were two lines of an off-white powdery substance on a granite-type block located upstairs in Meehan's house. Meehan suggested that Schreiber "snort" one line, and then he left to find some paper in which Schreiber could take home the other line. Schreiber testified that when Meehan left the room, she brushed one line onto the floor and that after Meehan returned with some paper, she brushed the other line into it, folded it up, and placed it in her pocket. Eventually, this substance was sent to the Nebraska State Patrol Criminalistics Laboratory and was

determined to be methamphetamine. Schreiber testified that a number of people smoked marijuana at Meehan's house on the night she obtained the methamphetamine.

At trial, Meehan moved to dismiss count I, asserting the defense of entrapment. The trial court overruled Meehan's motion.

*Subornation of Perjury.*

On June 23, 1995, Dan Klimek and Dan Bartling, drug investigators with the Nebraska State Patrol, went to Meehan's house in Waco to serve a search warrant. Meehan was home at the time, as was Lee Smith, who was staying with Meehan. Smith was arrested after the officers found a white, powdery substance in a container in her purse. In a desk located in a bedroom, officers found, among other things, a spoon with a white, powdery substance on it and two boxes of plastic baggies. Meehan and Smith were both arrested for and charged with possession of a controlled substance. It later became a subject of dispute as to whether the powdery substance on the spoon, later determined to be methamphetamine, belonged to Meehan or to Smith.

Schreiber testified that she spoke with Meehan on October 19, 1995. She stated that the impression she received from her conversation with Meehan was that Meehan's then-lawyer and Smith's lawyer had come up with a scheme whereby, with Meehan's cooperation, they would attempt to get evidence related to Smith suppressed and, in turn, Smith would testify at Meehan's trial that the drugs in Meehan's house were all hers.

Gary Harre testified that Smith came to live with him after she posted bond following her arrest. Harre stated that Meehan told Harre that Meehan wanted to speak with Smith about her taking responsibility for all the drugs found at Meehan's residence.

Smith testified that she was jailed for approximately 30 days following her arrest before she was released on bail. She said that she stayed with Harre for several weeks and was then rearrested for violation of her bond. Smith stated that Meehan visited her while she was in jail and that he attempted to persuade her to say that all the drugs were hers. Smith testified that before she returned to jail, she visited with Meehan's lawyer, who explained to her that if evidence in her case was sup-

pressed, the charges against her would be dropped, and that if she later testified in Meehan's trial that the drugs were hers, no further charges could be brought against her because double jeopardy would have attached.

Smith testified that on October 18, 1995, her court-appointed attorney visited her in jail and told her that Meehan's attorney was at the jail with a court reporter. According to Smith, her lawyer told her that Meehan's lawyer had guaranteed that if she made a statement that the drugs were hers, she would be bonded out of jail within the hour. Smith's statement, made before a court reporter/general notary public, is part of the record in this case. The statement is 32 pages long. It is in the form of questions and answers posed by the lawyers and answered by Smith. There is no case caption on the statement or other indication linking it to any particular adjudicative event. In the statement, Smith swore to tell the truth; however, the statement is not signed by Smith. In the statement, Smith states, inter alia, that the methamphetamine found on the spoon in Meehan's house was hers.

Smith testified at trial that she was released from jail about one-half hour after giving her statement to Meehan's lawyer. She further testified that her statement that all the methamphetamine was hers was not true but that she had said it to get out of jail. Smith stated that in February 1996, she disclosed the scheme to Charles Campbell, the York County Attorney, during a meeting she had with Campbell regarding another case.

Meehan's mother, Charlene Meehan, testified that she did not know Smith but that Meehan's lawyer told Charlene and her husband that they should post a $2,000 bond for Smith. Charlene said that the lawyer told her and her husband that he planned to take a sworn statement from Smith the following day. Charlene testified that the lawyer told them he would call them when he had the statement and that he, in fact, did so. Charlene stated that, on the lawyer's advice, they arranged for a third individual to actually post the bond with their money because the lawyer said that "it would look better this way."

At the time of trial, Meehan was represented by a different lawyer than the lawyer to whom reference is made above and who was allegedly involved in the purported scheme. Meehan's

first lawyer testified that there was no connection between the posting of Smith's bond and her statement given shortly beforehand. The lawyer denied being part of a plan to influence Smith's testimony by posting her bond.

Also testifying at trial was the lawyer who defended Smith at the suppression hearing in the separate case against her. This lawyer stated that he could not recall meeting with Smith at the jail shortly before she gave her statement. However, he acknowledged that his signature appeared on the jail log of visitors for that day, and he testified he was present when Smith's statement was taken. The lawyer admitted that he knew that Meehan's lawyer wanted to obtain Smith's statement before a court reporter and that he knew that the statement to be made by his client would be very damaging to her. Smith's lawyer denied telling Smith that Meehan's lawyer said that she would be bonded out of jail that day if she made the statement.

In connection with finding Meehan guilty of counts III through V, the court stated, in part, that it was convinced that there was a scheme or plan pertaining to Smith's testimony and that, while the court was convinced that Meehan did not devise the plan, he was a willing and active participant in it.

*Sentencing.*

At the sentencing hearing, Meehan noted that the presentence investigation report contained a synopsis of a statement given to the Lincoln Police Department by Bob Radar, an acquaintance of Meehan. Meehan objected to that part of the report being included in the presentence investigation report because he was not familiar with anyone named in the report, because the report was not the basis for any charge ever filed, and because he had not had the opportunity to confront Radar.

Meehan was sentenced as follows: on count I, not less than 2 nor more than 4 years' imprisonment; on count III, not less than 4 nor more than 5 years' imprisonment; on count IV, not less than 4 nor more than 5 years' imprisonment; on count V, not less than 6 nor more than 8 years' imprisonment. The sentences imposed in counts III, IV, and V are to be served concurrently with one another but consecutively to the sentence in count I. Meehan appeals.

## ASSIGNMENTS OF ERROR

Meehan claims that the trial court (1) erred in failing to find as a matter of law that the State failed to prove beyond a reasonable doubt that Meehan was predisposed to violate the law before the government induced him to do so; (2) erred in failing to find as a matter of law that the State failed to prove beyond a reasonable doubt that Meehan persuaded, procured, or suborned another person to make a false statement under oath or equivalent affirmation in an official proceeding; (3) abused its discretion in refusing to strike an interview from Meehan's presentence investigation report and in considering the interview in connection with his sentencing; and (4) abused its discretion by imposing excessive sentences.

## STANDARD OF REVIEW

On questions of law, an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *State v. Vidales*, 6 Neb. App. 163, 571 N.W.2d 117 (1997).

## ANALYSIS

*Entrapment.*

With regard to count I, delivery of a controlled substance, Meehan argues that the trial court erred in not finding that he was entrapped by the government to break the law. Meehan asserts that there is no evidence presented by Schreiber or Edmunds that Meehan had a predisposition to deliver illegal drugs prior to Meehan's first contact with Schreiber and Edmunds on October 18, 1994.

In Nebraska jurisprudence, entrapment is " 'the governmental inducement of one to commit a crime not contemplated by the individual, in order to prosecute that individual for the commission of the criminal offense.' " *State v. Connely*, 243 Neb. 319, 330, 499 N.W.2d 65, 73 (1993), quoting *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992). Entrapment occurs when the criminal intent or design originates with governmental officials who implant in the mind of an innocent person the disposition to commit a criminal offense and who induce criminal conduct in order to prosecute the criminal offense induced. *State v. Connely, supra.*

 Nebraska has adopted the "origin of intent" test to determine whether a defendant was entrapped. Under this test, the defendant has been entrapped if (1) the government induced the defendant to commit the offense charged and (2) the defendant's predisposition to commit the criminal act was such that the defendant was not otherwise ready and willing to commit the offense on any propitious opportunity. *State v. Connely, supra; State v. Stahl, supra.* The ultimate focus of the "origin of intent" test is whether the defendant was predisposed to commit the crime. *State v. Connely, supra; State v. Stahl, supra.*

 Entrapment is an affirmative defense, and thus the burden of going forward with evidence of governmental inducement is on the defendant. *State v. Connely, supra; State v. Stahl, supra.* Once the defendant satisfies his or her burden of producing sufficient evidence to raise an entrapment defense, the ultimate burden of proof is on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *State v. Connely, supra; State v. Stahl, supra.*

In the present case, Meehan argues that in the course of Schreiber's contacts with him on October 18 and 24 and November 4, 1994, there is no evidence that Meehan expressed a willingness to deliver drugs to Schreiber or to Edmunds, and he notes that, in fact, no drugs were delivered in the course of those contacts. On November 9, Schreiber searched for Meehan, located him, and asked him one or two times whether he could obtain methamphetamine for her. Meehan asserts that he scraped an extremely small amount of methamphetamine for Schreiber only after her repeated attempts to obtain the drug from him.

 The Nebraska Supreme Court has, on several occasions, considered what type of evidence is relevant to demonstrate the predisposition of the defendant. That court has noted that a defendant's readiness and willingness to enter into the illegal transaction when asked to may be used to show predisposition. *State v. Parks,* 212 Neb. 635, 324 N.W.2d 673 (1982). The court has further noted that " 'ready access to illicit drugs is a legitimate factor . . . to consider on the question of predisposition.' " *State v. Connely,* 243 Neb. at 332, 499 N.W.2d at 74. " '[A] familiarity with and demonstrable orientation to the relevant

activity also constitutes relevant evidence of predisposition.' " *Id.* In *Connely*, the defendant's knowledge of drug sale practices and command of the vernacular for the particular drug deal involved was also considered evidence of predisposition.

In the present case, each of the above factors noted in *Parks* and *Connely* was present. There is evidence in the record that Meehan was ready and willing to enter into a drug transaction. He repeatedly assured Schreiber that he could obtain methamphetamine for her. Meehan spoke of drug contacts he had in York and of his knowledge of drug activity in the area, and he stated at one point that he had expected to get an eight ball but got only 2 grams. Schreiber observed people smoking marijuana at Meehan's house.

Meehan was clearly familiar with the traffic in methamphetamine and demonstrated familiarity with the drug sale practices and prices of the drug in the community. Meehan spoke in the vernacular of the drug trade. Based, inter alia, on the foregoing, there was adequate evidence upon which the district court could conclude that Meehan was predisposed to commit the crime for which he was charged and was not entrapped. Meehan's assignment of error is without merit.

*Subornation of Perjury.*

Meehan asserts that under the statutory language of § 28-915, he did not commit the offense of subornation of perjury. Meehan's argument is that (1) because the statement given by Smith to Meehan's attorney on October 18, 1995, was not made in an official proceeding, it was not perjury and, therefore, Meehan did not suborn perjury and (2) because Smith retracted the falsification, Smith's statement was not perjury and, therefore, Meehan did not suborn perjury.

Section 28-915, pertaining to perjury and subornation of perjury, provides:

> (1) A person is guilty of perjury, a Class III felony, if in any official proceeding he or she makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he or she does not believe it to be true.

(2) A person is guilty of subornation of perjury, a Class III felony, if he or she persuades, procures, or suborns any other person to commit perjury.

. . . .

(5) No person shall be guilty of an offense under this section if he or she retracted the falsification in the course of the proceeding in which it was made before it became manifest that the falsification was or would be exposed and before the falsification substantially affected the proceeding.

Neb. Rev. Stat. § 28-916.01(7) (Reissue 1995) defines an "official proceeding" as "a proceeding heard or which may be heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or deposition in connection with any such proceeding."

The record shows without dispute that Smith's statement was made at the York County jail in the presence of her attorney, Meehan's attorney, and the court reporter/general notary public. It is also undisputed that no representative of the State attended or was notified that such a meeting was to take place. The statement itself does not bear a case caption or other title linking it to an adjudicative forum. Following our review of the record, we conclude as a matter of law that Smith's statement was not made in a "proceeding" as that term is used in §§ 28-915 and 28-916.01(7), much less an "official proceeding."

To be guilty of subornation of perjury, an individual must persuade, procure, or suborn another person to commit perjury. § 28-915(2). Perjury is a false statement made under oath in an official proceeding. § 28-915(1). An "official proceeding" is "a proceeding . . . heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath . . . in connection with any such proceeding." § 28-916.01(7).

Under a plain reading of the foregoing statutes taken together, it is clear that for a statement to amount to perjury it must be false, made under oath, and made before any legislative, judicial, administrative, or other governmental agency or

made before an official authorized to take evidence under oath "in connection with any such proceeding" as specified in § 28-916.01(7). Statutory language is to be given its plain and ordinary meaning. *State v. Brown*, 5 Neb. App. 889, 567 N.W.2d 307 (1997).

The proceedings specified in § 28-916.01(7) are listed as proceedings "heard before any legislative, judicial, administrative, or other governmental agency" or before an "official authorized to take evidence under oath . . . in connection with any such proceeding." The statement given by Smith was clearly not made before any legislative, judicial, administrative, or other governmental agency. The statement given by Smith at the jail, although sworn to before an individual authorized to record evidence and regardless of whether or not false or material, was not made in "any such proceeding" as enumerated in § 28-916.01(7). In sum, the episode at the jail was not a proceeding as contemplated by § 28-916.01(7), and, therefore, the statement was not perjury under § 28-915(1).

As noted above, Nebraska's perjury statute defines as an element of the crime that the statement in question must be given in an "official proceeding," which is defined in § 28-916.01(7). See, also, *State v. Douglas*, 222 Neb. 833, 388 N.W.2d 801 (1986). As a clearly defined element of the offense, the meaning of the term "official proceeding" must be strictly construed. See *State v. Brown, supra.*

On the record before us, we find that Smith's statement did not occur within an "official proceeding" or in connection with a proceeding authorized by the Nebraska rules of civil discovery or criminal procedure. Smith's statement was given in the York County jail in the presence of her counsel and Meehan's counsel. No law enforcement officials were present, nor was there counsel for the State. There is no indication in the record of advance notice of the taking of the statement, and no cross-examination of Smith occurred.

Other courts examining the "official proceeding" requirement of perjury statutes have strictly construed it. See *State v. Adkins*, 553 So. 2d 294 (Fla. App. 1989) (false, notarized statements in connection with motor vehicle title application were not given in "official proceedings"). See, also, *Sevin v. State*,

478 So. 2d 521 (Fla. App. 1985); *McCoy v. State*, 338 So. 2d 52 (Fla. App. 1976); and *Commonwealth v. Dawson*, 399 Mass. 465, 504 N.E.2d 1056 (1987) (all holding that false sworn statements in law enforcement investigations were not given in official proceedings).

It has been held that the "official proceeding" requirement must be affirmatively proven as an element of perjury.

> This construction of the statute [regarding official proceedings] is consistent with the realization that notaries public not only swear persons in connection with official proceedings but also notarize many sworn statements— affidavits, agreements, and the like—which are frequently not related to a pending legislative, judicial, administrative, or other government agency proceeding.

*Nessmith v. State*, 472 So. 2d 1248, 1253 (Fla. App. 1985). The Florida court continued: " '[A] proceeding is not made official by the formality with which it is conducted; instead, *its officiality depends on its purpose and the authority from which it derives.*' " (Emphasis in original.) *Id.* at 1254.

We note that a different Nebraska statute, Neb. Rev. Stat. § 28-915.01 (Reissue 1995), defines the crime of making false statements under oath in circumstances other than official proceedings, sometimes referred to as "false swearing." It is also possible that one might be charged with *attempted* subornation of perjury. See *State v. Cooley*, 217 Neb. 90, 348 N.W.2d 433 (1984). However, in the instant case, Meehan was charged with subornation of perjury, and that was the charge tried and submitted to the jury. We will not consider possible crimes which were not adjudicated in the trial court. See *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994).

For the sake of completeness, we note that a number of state statutes have liberalized, or even eliminated, the requirement that the false material sworn statements must be made in an official proceeding to amount to perjury. See, e.g., *Gargan v. State*, 805 P.2d 998, 999 (Alaska App. 1991) (referring to "AS 11.56.200(a) and AS 11.31.110(a)"), *cert. denied* 501 U.S. 1209, 111 S. Ct. 2808, 115 L. Ed. 2d 981.

Finally, with reference to the Nebraska perjury statute, in *State v. Douglas*, 222 Neb. 833, 842-43, 388 N.W.2d 801, 807

(1986), the Nebraska Supreme Court ruled that in addition to the requirement that perjury can occur only in an "official proceeding," perjury can only happen "in a circumstance where a specific statute explicitly requires an oath to be administered."

Nebraska law empowers notaries public to administer oaths for truthfulness, Neb. Rev. Stat. § 64-201 et seq. (Reissue 1996). Nebraska law neither encourages nor prohibits any person from making a voluntary statement on any subject he or she chooses, at any time, and no authority could be found which mandates that a notary public administer an oath for truthfulness in connection with notarization when a voluntary statement is made, such as Smith's statements. Smith's statements were voluntary. She was not subpoenaed for deposition or other official testimony, see, e.g., Neb. Rev. Stat. §§ 25-1227 and 29-1901 (Reissue 1995), nor did Smith make the statement at the request of, or in the presence of, an authorized officer pursuant to subpoena, see, e.g., Neb. Rev. Stat. § 87-303.03 (Reissue 1994).

We find the Nebraska Supreme Court's analysis in *Douglas* helpful and controlling. In *Douglas*, after making false statements in testimony to members of a legislative committee, the former State Attorney General was convicted of perjury. In reversing Douglas' conviction for perjury, the Nebraska Supreme Court scrutinized the terms of § 28-915 and its legislative history. The court found that the Nebraska Legislature rejected the broader terms of the Model Penal Code and, instead, adopted the present Nebraska statutory imperative that an oath for truthfulness must be *required* from the defendant in order for an oath's violation to constitute an element of the crime of perjury. *State v. Douglas, supra.* Although Douglas took an oath for truthfulness before he testified, the oath was not mandatory; therefore, there was no perjury.

Similarly, we find that Smith's voluntary statement, like the statement at issue in *Douglas*, did not satisfy the statutory elements for perjury because there was no requirement that Smith take an oath for truthfulness prior to making her statement. We further note that there is no indication in the statement that Smith's statement was necessarily recorded for use as substantive evidence in an official proceeding. See, e.g., *State v. Jacobson*, 74 Wash. App. 715, 876 P.2d 916 (1994); *People v.*

*Chaussee*, 847 P.2d 156 (Colo. App. 1992), *modified* 880 P.2d 749 (Colo. 1994).

Because we conclude that the meeting which took place at the jail was not a proceeding, nor was the statement made in connection with any such proceeding as contemplated by the statutes governing perjury, nor was an oath required under the circumstances, Smith's statement cannot be construed as perjury, and Meehan, in turn, cannot have suborned perjury. Accordingly, we reverse Meehan's conviction and sentence on count V, subornation of perjury.

*Radar's Statement and Meehan's Sentences.*

Meehan objects to the inclusion of a statement by Radar, an acquaintance of Meehan, in Meehan's presentence investigation report. The report generally dealt with Radar's contact with Meehan prior to the instant case. A sentencing court has broad discretion in the source and type of evidence that it may use in determining the kind and extent of punishment to be imposed within the limits fixed by statute. *State v. Schmidt*, 5 Neb. App. 653, 562 N.W.2d 859 (1997). It has specifically been held that a sentencing court in noncapital cases may consider a defendant's nonadjudicated misconduct in determining an appropriate sentence. *Id.* In any event, the record does not reflect that Meehan was prejudiced by the inclusion of Radar's statement. Meehan's assignment of error regarding Radar's statement is without merit.

Meehan was convicted of two Class III felonies, counts I and V, for which the penalty as to each is a maximum of 20 years' imprisonment, a $25,000 fine, or both, and a minimum of 1 year's imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 1995). Counts III and IV are Class IV felonies, for which the penalty is a maximum of 5 years' imprisonment, a $10,000 fine, or both. *Id.* Meehan was sentenced to 2 to 4 years' imprisonment on count I. Consecutive to count I, Meehan was sentenced to 4 to 5 years' imprisonment on count III, 4 to 5 years' imprisonment on count IV, and 6 to 8 years' imprisonment on count V, to be served concurrently with each other. Because Meehan's conviction for count V is reversed, his sentence on that charge is vacated.

■ The sentences are all within statutory limits. A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Aguirre-Rojas*, 253 Neb. 477, 571 N.W.2d 70 (1997).

In sentencing Meehan, the trial judge focused on Meehan's prior criminal record and noted that Meehan's course of conduct dealt with the use and abuse of drugs and making drugs available to other people. Given the extent and history of Meehan's involvement as a supplier of controlled substances, not repeated here, the trial judge's comments and the sentences were appropriate. The sentence on count V is vacated. With regard to the remaining counts, the sentences imposed were within the statutory limits, and we find no abuse of discretion.

### CONCLUSION

Meehan's conviction for count V is reversed, and his sentence as to count V is vacated. We affirm Meehan's convictions and sentences as to the remaining counts.

AFFIRMED IN PART, AND IN PART
REVERSED AND VACATED.

Case reheard, *State v. Meehan*, 7 Neb. App. 639, 585 N.W.2d 459 (1998).